IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANTI HOLDINGS, LLC, MALONE MITCHELL, WINN INTERESTS, LTD., EQUINOX I. A TX, GREG PIPKIN, CRAIG JOHNSTONE, TRI-C AUTHENTIX, LTD., DAVID MOXAM, LAL PEARCE, and JIM RITTENBURG | § § § § § § § § § | No. 354, 2020<br><br>Court Below – Court of Chancery of the State of Delaware<br><br>C.A. No. 2017-0887-SG |
| Petitioners Below, Appellants/Cross-Appellees, | § § § § | |
| v. | § § | |
| AUTHENTIX ACQUISITION COMPANY, INC., | § § § § | |
| Respondent Below, Appellee/Cross-Appellant. | § § § § | |

Submitted: May 12, 2021
Decided: September 13, 2021

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED.**

John L. Reed, Esquire (argued), Peter H. Kyle, Esquire, Kelly L. Freund, Esquire, DLA PIPER LLP (US), Wilmington, Delaware; *for Appellants/Cross-Appellees Manti Holdings, LLC, Malone Mitchell, Winn Interests, Ltd., Equinox I. A Tx, Greg Pipkin, Craig Johnstone, Tri-C Authentix, Ltd., David Moxam, Lal Pearce, and Jim Rittenburg.*

Samuel A. Nolen, Esquire (argued), RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Andrew Hammond, Esquire, Michelle Letourneau-Belock, Esquire, Bryan Beaudoin, Esquire, WHITE & CASE LLP, New York, New York; *for Appellee/Cross-Appellant Authentix Acquisition Company, Inc.*

**MONTGOMERY-REEVES**, Justice, for the Majority:

In 2017, a third-party entity acquired Authentix Acquisition Company, Inc. ("Authentix"). The cash from the merger was distributed to the stockholders pursuant to a waterfall provision. The Authentix common stockholders received little to no consideration. A group of common stockholders filed a petition for appraisal in the Court of Chancery under Section 262 of the Delaware General Corporation Law ("DGCL"). Authentix moved to dismiss the petition, arguing that the petitioners had waived their appraisal rights under a stockholders agreement that bound the corporation and all of its stockholders. The Court of Chancery granted the motion to dismiss, holding that the petitioners had agreed to a clear provision requiring that they "refrain" from exercising their appraisal rights with respect to the merger. In a separate opinion, the court awarded the petitioners equitable interest on the merger consideration and declined to award Authentix pre-judgment interest under a fee-shifting provision. All parties appealed the Court of Chancery's decisions.

The arguments in this appeal largely focus on whether Section 262 of the DGCL prohibits a Delaware corporation from enforcing an advance waiver of appraisal rights against its own stockholders. Pointing to Delaware's strong policy favoring private ordering, Authentix argues that stockholders are free to set the terms that will govern their corporation so long as such alteration is not prohibited by statute or otherwise contrary to

the laws of this State. Authentix contends that a waiver of the right to seek appraisal is not prohibited by the DGCL and is not otherwise contrary to the laws of this State.

The petitioners recognize that the DGCL is flexible, but they argue that the DGCL has mandatory provisions that are fundamental features of the corporate entity's identity. These features, they contend, cannot be varied by a contract between the corporation and all its stockholders. The petitioners argue that, if one desires true "freedom of contract," Delaware provides that option through the alternative entity forms, which expressly give maximum effect to the principle of freedom of contract. The petitioners warn that, if this Court allows a waiver of any mandatory right under the DGCL, such as the right to demand appraisal, then any other right could be waived. For example, they argue that a Delaware corporation and all its stockholders could also agree to a preemptive and blanket waiver of their statutory right to seek books and records under Section 220, their ability to challenge an election under Section 225, their ability to bring an action to compel a stockholders' meeting under Section 211, and their ability to file a breach of fiduciary duty action, among others.

As a matter of public policy, there are certain fundamental features of a corporation that are essential to that entity's identity and cannot be waived. Nonetheless, it is the Court's view that the individual right of a stockholder to seek a judicial appraisal is not among those fundamental features that cannot be waived. Accordingly, we hold that Section 262 does not prohibit sophisticated and informed stockholders, who were represented by counsel and

3

had bargaining power, from voluntarily agreeing to waive their appraisal rights in exchange for valuable consideration.

This Court also affirms the other aspects of the Court of Chancery's decision. The petitioners agreed to a clear waiver of the appraisal rights with respect to the 2017 merger. Authentix was an intended beneficiary capable of enforcing that waiver. The waiver is not a stock restriction that had to be included in the corporation's charter, and Delaware corporations may enforce stockholders agreements. The Court of Chancery did not abuse its discretion by awarding the petitioners equitable interest on the merger consideration; nor did the court abuse its discretion by declining to award Authentix pre-judgment interest under a fee-shifting provision. Accordingly, the Court of Chancery's judgment is affirmed.

## I. BACKGROUND

### A. Parties and Relevant Non-Parties

Authentix is a Delaware corporation.[1]

Appellants and Cross-Appellees Manti Holdings, LLC; Malone Mitchell; Winn Interests, Ltd.; Equinox I. A Tx; Greg Pipkin; Craig Johnstone; Tri C Authentix, Ltd.; David Moxam; Lal Pearce; and Jim Rittenburg (collectively, the "Petitioners") were minority stockholders of Authentix before the corporation's merger with a third-party entity.[2]

---

[1] J.A. to Opening Br. 1600 (hereinafter, "J.A._").
[2] J.A. 1599-600.

4

The Carlyle Group and J.H. Whitney & Co. (collectively, "Carlyle") were majority stockholders of Authentix before the corporation's merger with a third-party entity.[3]

Authentix, Inc. is the predecessor entity to Authentix.[4]

## B. The Petitioners Enter into the Stockholders Agreement

In 2007, Authentix, Inc. retained an investment banker and began exploring its strategic and financial options.[5] At that time, each of the Petitioners owned stock in Authentix, Inc.; and Manti Holdings, LLC held a majority of the outstanding shares.[6] Several prospective bidders made offers, including Carlyle.[7] The Carlyle offer won out, and in 2008 Authentix, Inc. entered into a transaction under which it became a wholly-owned subsidiary of Authentix. Carlyle gained majority control of the parent corporation, Authentix.[8] The Petitioners rolled over or reinvested their stakes and became minority stockholders in the post-merger Authentix.[9]

As a condition of the 2008 merger, Carlyle required that Authentix and all of its stockholders enter into a stockholders agreement (the "Stockholders Agreement").[10] The Petitioners, Authentix, and Carlyle were all represented by counsel; the Stockholders

---

[3] J.A. 1601.
[4] J.A. 1600.
[5] *Id.*
[6] J.A. 1601. Manti Resources, Inc.—a related entity to Manti Holdings, LLC—may have owned some of these shares. *See id.*
[7] *Id.*
[8] *Id.*
[9] *Id.*
[10] *Id.* This Opinion discusses the relevant provisions of the Stockholders Agreement in the Analysis section. *See infra* Part III.

Agreement was not a contract of adhesion; and all of the parties received valuable consideration in exchange for entering into the agreement.[11] Authentix and each of the Petitioners signed the Stockholders Agreement, along with Carlyle.[12]

In 2009, Authentix sought to raise additional capital by issuing Series B preferred stock.[13] All of the existing stockholders, including the Petitioners, participated on a *pro rata* basis.[14] Carlyle and other stockholders purchased shares of the Series B preferred stock.[15] In connection with this transaction, the Stockholders Agreement was amended to add a definition of "Preferred Stock."[16]

### C.    Authentix Merges with a Third-Party Entity

On September 12, 2017, the Authentix board recommended a merger with a third-party entity.[17] On September 13, 2017, Carlyle approved the merger by written consent, and closing occurred the same day.[18] The Petitioners did not receive advance notice of the merger and were not given an opportunity to vote on the transaction.[19]

---

[11] J.A. 1601-04; *see, e.g.*, *Manti Hldgs., LLC v. Authentix Acq. Co.* (*Manti I*), 2018 WL 4698255, at *4 (Del. Ch. Oct. 1, 2018).

[12] J.A. 93-123.

[13] J.A. 1604.

[14] *Id.*

[15] *Id.*

[16] J.A. 58-59, 1604.

[17] *Manti Hldgs., LLC v. Authentix Acq. Co.* (*Manti III*), 2020 WL 4596838, at *2 (Del. Ch. Aug. 11, 2020).

[18] J.A. 164-168 (written consent); J.A. 170-257 (merger agreement).

[19] *See* J.A. 459-60 (Confidential Information Statement and Notice of Action by Written Consent and Approval of Merger).

Shortly after the merger closed, the Petitioners were provided with a written notice that the corporation had executed a merger agreement by written consent.[20] The notice summarized various details of the merger agreement and "request[ed] that [the recipient] execute [an attached] Written Consent to waive any appraisal rights that [they] may have under Section 262 of the DGCL pursuant to [their] obligations set forth in the Company's Stockholder's Agreement to which [they] are a party and to which [they] are bound."[21] The notice included a one-page disclosure informing the recipient of their appraisal rights:

**APPRAISAL RIGHTS OF STOCKHOLDERS**

The Company's stockholders who do not consent in writing to the Merger may be entitled to certain appraisal rights under Section 262 of the DGCL in connection with the Merger as described below. . . . **Stockholders who executed and delivered a written consent of stockholders to consent to the adoption of the Merger Agreement will not be entitled to these rights. [The recipient] [is] reminded that [they] have contractually agreed to refrain from exercising any appraisal rights pursuant to the Company Stockholders Agreement to which [they] are bound.**[22]

Under the merger agreement, all of the Petitioners' stock was cancelled and converted into a right to receive the merger consideration.[23] The merger consideration was to be distributed to stockholders based on a waterfall provision that gave priority to the

---

[20] *Id.*
[21] J.A. 459.
[22] J.A. 469.
[23] J.A. 193-200, at § 3.1.

preferred stockholders.[24]  It appears that common stockholders, like the Petitioners, could expect to receive little to no compensation for their cancelled stock and that nearly all of the merger consideration would be paid to the preferred stockholders, such as Carlyle.[25]

## D.    The Court of Chancery Dismisses the Appraisal Petition

In September and October of 2017, the Petitioners sent timely appraisal demands to Authentix.[26]  In response, Authentix requested that the Petitioners withdraw their appraisal demands and agree to exchange their shares for the merger consideration.[27]  The Petitioners refused and filed a petition (the "Appraisal Petition") in the Court of Chancery seeking to exercise their statutory appraisal rights under Section 262 of the DGCL.[28]  Authentix filed counterclaims and moved for summary judgment on the appraisal claim.[29]  The Petitioners moved to dismiss the counterclaims.[30]

On October 1, 2018, the Court of Chancery issued a letter opinion granting Authentix's motion for partial summary judgment and denying the Petitioners' motion to dismiss the counterclaims.[31]  The court held that the Petitioners had waived their appraisal

---

[24] J.A. 195-97, at § 3.1(f).
[25] J.A. 464.
[26] *Manti III*, 2020 WL 4596838, at *3.
[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Manti I*, 2018 WL 4698255, at *1-2.

8

rights under the Stockholders Agreement and that the appraisal waiver was not a stock restriction that must be included in the corporation's charter under Section 151(a).[32]

On August 14, 2019, the Court of Chancery issued a memorandum opinion denying the Petitioners' motion for reargument.[33] Among other things, the Petitioners argued that the court's October 2018 opinion erred because a Delaware corporation's stockholders cannot agree to a blanket and advance waiver of a mandatory statutory right, such as the right to demand a judicial appraisal under Section 262.[34] The court disagreed and held that the Petitioners agreed to a clear and enforceable waiver of their appraisal rights.[35]

On August 11, 2020, the Court of Chancery issued its final memorandum opinion, which addressed whether Authentix could enforce a fee-shifting provision and whether the Petitioners were entitled to interest on the merger consideration.[36] The court held that Authentix could enforce the fee-shifting provision but was not entitled to pre-judgment interest.[37] The court also awarded the Petitioners equitable interest on their portion of the merger consideration.[38]

---

[32] *Id.* at *3-5.
[33] *Manti Hldgs., LLC v. Authentix Acq. Co.* (*Manti II*), 2019 WL 3814453 (Del. Ch. Aug. 14, 2019).
[34] *Id.* at *3.
[35] *Id.* at *3-4.
[36] *Manti III*, 2020 WL 4596838, at *4-11.
[37] *Id.* at *4-10.
[38] *Id.* at *10-11.

Both sides have appealed. The Petitioners challenge the Court of Chancery's dismissal of their appraisal petition.[39] Authentix challenges the court's holdings granting the Petitioners equitable interest on the merger consideration and denying Authentix prejudgment interest under the fee-shifting provision.[40]

## II.     STANDARD OF REVIEW

This Court reviews *de novo* the Court of Chancery's grant of summary judgment.[41] Summary judgment is appropriate if, viewing the facts in the light most favorable to the nonmoving party, there are no disputed issues of material fact, and the moving party has demonstrated that it is entitled to judgment as a matter of law.[42]

The parties agree that there are no disputed issues of material fact.[43] Accordingly, the bulk of this appeal addresses whether the Court of Chancery committed errors of law in granting summary judgment against the Petitioners. The final two issues on appeal, however, add a second standard of review: whether the Court of Chancery abused its discretion by ordering improper relief.[44]

---

[39] Opening Br. 6-10.
[40] Answering Br. 5-11.
[41] *Monzo v. Nationwide Prop. & Cas. Ins. Co.*, 249 A.3d 106, 117 (Del. 2021).
[42] *Id.* (citing *Sherman v. Ellis*, 246 A.3d 1126, 1131 (Del. 2021)).
[43] *See, e.g.*, Opening Br. 2 ("The facts are undisputed; it remains only to apply the law and the language of the [Stockholders Agreement] to the facts."); Answering Br. 46 ("This Court . . . can . . . limit its holding to the undisputed facts of this case.").
[44] *See, e.g.*, *Boush v. Hodges*, 705 A.2d 242, 1998 WL 40220, at *2 (Del. Jan. 15, 1998) (TABLE).

10

## III. ANALYSIS

This appeal presents four issues. First, whether the Petitioners agreed to a clear waiver of their appraisal rights with respect to the 2017 merger. Second, whether a Delaware corporation can enforce a waiver of appraisal rights against its own stockholders. Third, whether the Court of Chancery abused its discretion by awarding the Petitioners equitable interest on the merger consideration. And fourth, whether the Court of Chancery erred by refusing to award Authentix pre-judgment interest on its attorneys' fees.

### A.   The Petitioners Agreed to a Clear Waiver of their Appraisal Rights

The first question on appeal is whether the Petitioners waived their statutory appraisal rights by agreeing, under Section 3(e) of the Stockholders Agreement, to "refrain" from exercising their appraisal rights with respect to a "Company Sale" if the board and Carlyle approve the transaction (the "Refrain Obligation"):

> [I]n the event that ... a Company Sale is approved by the Board and ... the Carlyle Majority, each Other Holder shall consent to and raise no objections against such transaction ..., and ... [shall] refrain from the exercise of appraisal rights with respect to such transaction.[45]

The Petitioners argue that the Refrain Obligation did not waive their appraisal rights with respect to the 2017 merger for three reasons. First, the Petitioners argue that the Refrain Obligation was never triggered because, under the 2017 merger agreement, the preferred stock held by Carlyle was not acquired on the "Same Terms and Conditions" as the common

---

[45] J.A. 73-74, at § 3(e).

stock held by the Petitioners.[46]  Second, the Petitioners argue that the Stockholders Agreement did not impose a clear *post-termination* duty to refrain from exercising appraisal rights because the contract's termination provision can be reasonably construed to extinguish all obligations, including the Refrain Obligation, "upon" the consummation of a Company Sale.[47]  Third, the Petitioners argue that the post-merger Authentix could not enforce the Stockholders Agreement because it was not an intended beneficiary.[48]  For the reasons provided below, this Court rejects each of these arguments.

### 1.    Principles of contract interpretation

The principles of contract interpretation under Delaware law are well-established. When interpreting a contract, Delaware courts read the agreement as a whole and enforce the plain meaning of clear and unambiguous language.[49] Contracts will be interpreted to "give each provision and term effect" and not render any terms "meaningless or illusory."[50] "When a contract is clear and unambiguous, the court will give effect to the plain meaning of the contract's terms and provisions."[51]  Language is ambiguous if it is susceptible to more

---

[46] Opening Br. 24-27.

[47] *Id.* at 18-23.

[48] *Id.* at 20-21.

[49] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010) (first citing *Kuhn Constr., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396-97 (Del. 2010); and then citing *Rhone-Poulenc Basic Chem. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992)).

[50] *Id.* at 1159 (quoting *Kuhn*, 990 A.2d at 396-97; *Sonitrol Hldg. Co. v. Marceau Investissements*, 607 A.2d 1177, 1183 (Del. 1992)).

[51] *Id.* at 1159-60 (citing *Rhone-Poulenc*, 616 A.2d at 1195).

12

than one reasonable interpretation.[52] An interpretation is unreasonable if it "produces an absurd result" or a result "that no reasonable person would have accepted when entering the contract."[53] "The parties' steadfast disagreement over interpretation will not, alone, render the contract ambiguous."[54]

### 2. The "Same Terms and Conditions" provision did not apply to the 2017 merger

The Petitioners argue that the 2017 merger did not trigger the Refrain Obligation because Carlyle received more compensation for its preferred stock than the Petitioners received for their common stock.[55] This argument rests on the premise that the 2017 merger was "structured as a sale of Equity Securities" because it involved the acquisition of control and not the acquisition of assets. Under Section 3(e) of the Stockholders Agreement, a "sale of Equity Securities" only triggers the Refrain Obligation if Carlyle's stock is acquired "on the Same Terms and Conditions" as stock held by Authentix's other stockholders. According to Petitioners, because the merger agreement paid more compensation for preferred stock than common stock, Carlyle's shares of

---

[52] *Id.* at 1160 (first citing *Twin City Fire Ins. Co. v. Del. Racing Ass'n*, 840 A.2d 624, 628 (Del. 2003); and then citing *Rhone–Poulenc*, 616 A.2d at 1195); *see also Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019) ("If, after applying these canons of interpretation, the contract is nonetheless 'reasonably susceptible [to] two or more interpretations or may have two or more different meanings,' then the contract is ambiguous . . . ." (quoting *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996))).

[53] *Osborn*, 991 A.2d at 1160 (citations omitted).

[54] *Id.* (citing *Rhone-Poulenc*, 616 A.2d at 1195).

[55] Opening Br. 24-27.

13

preferred stock were not acquired "on the Same Terms and Conditions" as the Petitioners' shares of common stock. Thus, the 2017 merger did not trigger the Refrain Obligation.[56]

Under Section 3(e) of the Stockholders Agreement, Carlyle can exercise certain drag-along rights if a "Company Sale . . . is structured as a sale of Equity Securities."[57] These rights are contingent, however, on the condition that stock held by the "Other Holders," like the Petitioners, is acquired "on the Same Terms and Conditions" as Carlyle's stock (the "Same-Terms Requirement").[58] The Stockholders Agreement defines "Same Terms and Conditions" to mean "the same price and otherwise on the same terms and conditions . . . ."[59]

The first question that the Court must address is whether the 2017 merger triggered the Same-Terms Requirement because it was a Company Sale, "structured as a sale of Equity Securities," that involved the "acquisition of the Equity Securities" held by Carlyle.[60] The Stockholders Agreement's definition of Equity Securities encompasses common stock, preferred stock, stock options, and other convertible securities.[61] The Stockholders Agreement divides the definition of a Company Sale into two types of transactions: equity transactions "(whether such transaction is effected by merger, consolidation,

---

[56] *See id.*

[57] J.A. 73-74.

[58] *Id.*

[59] J.A. 69.

[60] *See* J.A. 74-74, at § 3(e).

[61] J.A. 67 ("'Equity Securities' means the Shares, any options to purchase shares of Common Stock and any Convertible Securities."); J.A. 69 ("'Shares' means the shares of Preferred Stock and Common Stock currently issued and outstanding or that are hereafter issued to the Holders.").

recapitalization, sale or transfer of the Company's capital stock or otherwise)" and asset transactions.[62]

Petitioners are correct that the definition of Company Sale lumps mergers in the same *category* as stock transactions. That fact does not support Petitioners' position that all mergers are "structured as a sale of Equity Securities," however, because mergers and stock sales are two different types of transactions, even if they achieve a similar result. Carlyle structured the 2017 merger to allow an outsider to gain control of Authentix without acquiring any of the stock held by Carlyle or the Petitioners. Indeed, the merger agreement cancelled all outstanding stock in exchange for the right to receive the merger consideration.[63] Thus, the 2017 merger was not "structured as a sale of Equity Securities;"[64] none of Carlyle's stock was "acqui[red]" under the 2017 merger agreement;[65] the 2017 merger did not trigger Same-Terms Requirement; and it is irrelevant that Carlyle received more compensation for its preferred stock than the Petitioners received for their common stock.

The Petitioners other arguments do not change our analysis. Holding that the 2017 merger was not "structured as a sale of Equity Securities" does not render surplusage the requirement under Section 3(e) that minority stockholders "execute any purchase

---

[62] J.A. 65 (formatting added); *see* Opening Br. 25-27.
[63] J.A. 193-94, at § 3.1(a)-(b).
[64] J.A. 74, at § 3(e).
[65] *Id.*

15

agreement, *merger agreement* or other agreement" in connection with a Company Sale that is structured as a sale of Equity Securities."[66] That provision leaves flexibility for transaction planners if other transactions are being undertaken with the equity purchase.

Similarly, federal opinions holding that mergers involve an offer or purchase of securities under the securities laws are inapposite.[67] Whether a merger meets the statutory definition for a sale of securities under federal or state securities law has no bearing on whether a merger is "structured as a sale of Equity Securities" under the Stockholders Agreement.[68] There is no suggestion that the parties looked to the securities laws to construe these terms. Accordingly, this Court affirms the Court of Chancery's holding that the Same-Terms Requirement did not apply to the 2017 merger.

3.    **The Refrain Obligation clearly waived the Petitioners' appraisal rights with respect to the 2017 merger**

The Petitioners argue that they did not agree to a clear waiver of their appraisal rights with respect to the 2017 merger. According to the Petitioners, Section 12 of the Stockholders Agreement provides that all obligations created under the contract cease when a Company Sale is consummated (the "Termination Provision").[69] Noting that there is no

---

[66] *Id.*

[67] Opening Br. 26 n.5 (first citing *Mader v. Armel*, 402 F.2d 158, 160 (6th Cir. 1968); and then citing *Murphy v. Stargate Def. Sys. Corp.*, 498 F.3d 386, 391 (6th Cir. 2007)).

[68] J.A. 73.

[69] J.A. 89. ("Section 12. <u>Termination.</u> This Agreement, and the respective rights and obligations of the Parties, shall terminate upon the earlier of the: (a) consummation of a Company Sale; and [sic](b) execution of a written agreement of each Party (other than the Management Holders who are not also Rollover Stockholders or Reinvesting Stockholders) to terminate this Agreement;

16

dispute the Refrain Obligation is an "obligation,"[70] the Petitioners conclude that they were not subject to a clear *post-termination* duty to refrain from filing the Appraisal Petition.[71] The Petitioners also claim that the Refrain Obligation's use of the word "refrain" rather than "waive" cements that they did not agree to permanently relinquish their appraisal rights.[72]

In addition to the ordinary principles of contract interpretation, we consider the law regarding contractual waivers of statutory rights. Under Delaware law, "[w]aiver is the intentional relinquishment of a known right."[73] "A waiver may be either express or implied, but either way, it must be unequivocal."[74] The contractual waiver of a statutory right must

---

provided, <u>however</u>, that <u>Section 2</u>, <u>3</u>, <u>4</u>, <u>6</u>, <u>7</u>, <u>8</u>, and <u>9</u> hereof shall terminate upon the closing of an IPO.").

[70] *See, e.g.*, Opening Br. 6 (referring to the Refrain Obligation as an "obligation"); Answering Br. 5 ("The Court of Chancery correctly interpreted the Stockholders Agreement, holding that the Agreement *obligated* Petitioners to refrain from exercising appraisal rights and that Authentix could enforce *this obligation* post-merger." (emphasis added)).

[71] Opening Br. 19.

[72] *Id.* ("One does not have to 'refrain' from exercising a right they already 'waived.'").

[73] *Minna v. Energy Coal S.p.A.*, 984 A.2d 1210, 1214 (Del. 2009) (citing *AeroGlob. Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)).

[74] *Dirienzo v. Steel P'rs Hldgs. LP.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009) (citing *Rose v. Cadillac Fairview Shopping Ctr. Props. (Del.), Inc.*, 668 A.2d 782, 786 n. 1 (Del. Super. Ct. 1995)).

be clear to be enforceable.[75] "[T]he standards for proving waiver under Delaware law are 'quite exacting,'"[76] and "[t]he facts relied upon to prove waiver must be unequivocal."[77]

Turning to the Stockholders Agreement, this Court agrees with the Court of Chancery that the Refrain Obligation imposed a clear post-termination duty on the Petitioners to refrain from exercising their appraisal rights with respect to the 2017 merger.[78] The only reasonable interpretation of the Refrain Obligation is that the Petitioners agreed to not seek a judicial appraisal if Carlyle and the board approved a Company Sale. This obligation was designed to apply after a Company Sale is consummated, as a stockholder may only "commence an appraisal proceeding" "within 120 days *after* the effective date of the merger or consolidation . . . ."[79] And regardless of whether a stockholder begins to exercise its appraisal rights before a merger has closed by providing notice of its intent to

---

[75] *See, e.g.*, *Halpin v. Riverstone Nat'l, Inc.*, 2015 WL 854724, at *8 (Del Ch. Feb. 26, 2015) (first citing *In re Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 977 (Del. Ch. 1997) ("Since Section 262 represents a statutorily conferred right, it may be effectively waived in the documents creating the security only when that result is quite clearly set forth when interpreting the relevant document . . . ."); and then citing *Libeau v. Fox*, 880 A.2d 1049, 1057 (Del. Ch. 2005) ("To ensure that the statutory right to partition is not arbitrarily lost, Delaware requires that any contractual relinquishment of the partition right be by clear affirmative words or actions . . . ."), *aff'd in part and rev'd in part on other grounds*, 892 A.2d 1068 (Del. 2006)); *see also Dirienzo*, 2009 WL 4652944, at *4 ("An express waiver exists where it is clear from the language used that the party is intentionally renouncing a right that it is aware of."); *Kortum v. Webasto Sunroofs, Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000) ("There can be no waiver of a statutory right unless that waiver is clearly and affirmatively expressed in the relevant document." (citing *Hintmann v. Fred Weber, Inc.*, 1998 WL 83052 (Del. Ch. Feb. 17, 1998))).

[76] *Bantum v. New Castle Cnty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005)).

[77] *Id.* (alteration in original) (quoting *AeroGlobal*, 871 A.2d at 444).

[78] *See, e.g.*, *Manti I*, 2018 WL 4698255, at *3.

[79] 8 *Del. C.* § 262(e).

seek a judicial appraisal,[80] the clear purpose of the Refrain Obligation was to assure Carlyle and future acquirers that the minority stockholders would not be able to obtain a judicial appraisal *after* a Company Sale had closed.

The Petitioners try to muddy this analysis by arguing that the Termination Provision extinguished the Refrain Obligation when the 2017 merger closed.[81] If the Termination Provision is read in isolation, the Court might be inclined to agree with this analysis. But Delaware courts read contracts as a whole, and interpretations that are commercially unreasonable or that produce absurd results must be rejected.[82] The Petitioners' interpretation is commercially unreasonable. It is difficult to imagine that reasonable parties would draft a contractual provision that would require stockholders to "refrain" from exercising a right that would never be ripe to exercise. And it is incredible that the parties included the Refrain Obligation to block appraisal rights only in a roundabout fashion by stopping stockholders from taking the preliminary steps needed to perfect their appraisal claims.[83]

---

[80] *See* Opening Br. 22-23.

[81] Opening Br. 17-27.

[82] *Osborn*, 991 A.2d at 1159-60.

[83] The Petitioners claim that that this case is "analogous" to *Halpin v. Riverstone National, Inc.*, where the Court of Chancery held that the respondent in an appraisal proceeding could not enforce drag-along rights after a merger had closed. 2015 WL 854724, at *2-4 (Del. Ch. Feb. 26, 2015). In *Halpin*, the respondent sought to enforce drag-along rights that it failed to trigger while the stockholders agreement was in force. *See id.* at *8-10. Contrastingly, in this case the Refrain Obligation was triggered when the board and Carlyle approved the merger. *See* J.A. 73-74, at § 3(e) (providing that the Refrain Obligation is triggered if, *inter alia*, "a Company Sale is approved by the Board and either . . . the holders of at least fifty percent (50%) of the then-outstanding Shares or . . . the Carlyle Majority . . . ."). Accordingly, *Halpin* is distinguishable

19

Finally, we are not persuaded by the distinction that the Petitioners make between agreeing to "refrain" from exercising appraisal rights and agreeing to "waive" appraisal rights.[84] The Refrain Obligation only bars the Petitioners from exercising their appraisal rights if certain conditions are satisfied.[85] It therefore makes sense that the parties used the word "refrain" rather than "waive" when drafting the Refrain Obligation. The Petitioners did not "relinquish" their appraisal rights.[86] The Petitioners agreed "to keep [themselves] from" exercising their appraisal rights if certain criteria were met.[87] Thus, the structure of the Refrain Obligation explains why the parties used the word "refrain" when agreeing to a contingent waiver of appraisal rights.

As the Court of Chancery correctly concluded, "No contracting party, agreeing to the quoted language, would consider itself free to exercise appraisal rights in light of Board

___

because Authentix seeks to enforce a waiver that was triggered before the Stockholders Agreement terminated.

[84] *See, e.g.*, *Bantum v. New Castle C'ty Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) ("Waiver is the voluntary and intentional relinquishment of a known right. It implies knowledge of all material facts and an intent to waive, together with a *willingness to refrain* from enforcing those [] rights." (quoting *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 444 (Del. 2005))).

[85] For example, the Refrain Obligation would only be triggered if Authentix was sold to an outsider. J.A. 88 ("'Company Sale' means the consummation of any transaction or series of transactions pursuant to which one or more Persons or group of Persons (*other than* any Initial Carlyle Stockholder, Manti, Whitney or any of the respective Affiliates" acquires control of Authentix. (emphasis added)); J.A. 73-74 (tying the Refrain Obligation to a Company Sale).

[86] *See* Opening Br. 19 (citing *Waive*, Meriam-Webster Online Dictionary (last visited Sept. 7, 2021) ("waive" means "to relinquish (something such as a legal right) voluntarily"), https://www.merriam-webster.com/dictionary/waive).

[87] *Id.* (citing *Refrain*, Meriam-Webster Online Dictionary (last visited Sept. 7, 2021) ("refrain" means "to keep oneself from doing"), https://www.merriam-webster.com/dictionary/refrain).

approval of a contractually compliant Company Sale."[88]  Accordingly, the only reasonable

interpretation of the Stockholders Agreement is that the Refrain Obligation imposed a post-

termination duty on the Petitioners to "refrain" from filing the Appraisal Petition.  To hold

otherwise would undermine the objective intent of the bargain the parties struck and lead to

the absurd result that a contractual provision included to stop the Petitioners from exercising

their appraisal rights would never impose a burden on the Petitioners to refrain from filing

an appraisal petition.[89]

### 4.    Authentix is the intended beneficiary of the Refrain Obligation

The Petitioners' final contractual argument is that post-merger Authentix was not an

intended beneficiary capable of enforcing the Stockholders Agreement.[90]  The Petitioners

seem to reason that because the 2017 merger agreement resulted in a complete change in

ownership, post-merger Authentix is not a party to the Stockholders Agreement even though

it was the surviving entity under the merger agreement.  In other words, the Petitioners

complain that they "did not enter into the [Stockholders Agreement] with the buyer . . . ."[91]

---

[88] *Manti I*, 2018 WL 4698255, at *3.

[89] The Petitioners and the Dissent suggest several changes the parties could have made to make it clearer that the Refrain Obligation was intended to survive termination, such as using the word "waive" instead of "refrain," including a savings clause, or stating that the Petitioners agreed to refrain from exercising their appraisal rights "at any time."  With the benefit of hindsight, these changes might have headed off the current dispute.  Even without these changes, however, the Refrain Obligation in present form clearly waives the Petitioners' appraisal rights with respect to the 2017 merger.

[90] Opening Br. 20-21.

[91] *Id.*  The Petitioners also seem to argue that post-merger Authentix—along with all of the other parties to the Stockholders Agreement—cannot enforce the Refrain Obligation because that obligation was extinguished when the 2017 merger closed.  *See, e.g.*, *id*.  The Court rejects this argument for the reasons provided above.

This argument misses the mark for several reasons. First, it is a fundamental principle of Delaware law that a corporation is an entity, capable of forming a contract,[92] with an identity *separate* from its stockholders.[93] Thus, the change in control did not alter *Authentix's* status as a party to the Stockholders Agreement.

Because Authentix is a party to the Stockholders Agreement, it need not rely on its status as an intended beneficiary to enforce the agreement.[94] Nonetheless, if anyone is an intended beneficiary of the Refrain Obligation it is Authentix. The "surviving or resulting corporation" is the respondent in an appraisal proceeding that would be liable for paying the petitioner fair value for its cancelled stock.[95] Thus, the parties must have recognized when they formed the Stockholders Agreement that the Refrain Obligation was intended to benefit Authentix—or the "resulting corporation" under different circumstances—by providing a defense to an appraisal petition. Accordingly, Authentix could rely on its status

---

[92] *See, e.g.*, 8 *Del. C.* § 122(13) ("Every corporation created under this chapter shall have the power to . . . (13) Make contracts . . . .").

[93] *See, e.g.*, *Cargill, Inc. v. JWH Special Circumstance LLC*, 959 A.2d 1096, 1109 (Del. Ch. 2008) ("Even though every stockholder of a corporation may change, the corporation maintains its own identity in perpetuity, because it is a separate and distinct legal entity from its shareholders." (first citing 8 *Del. C.* § 102(b)(5); and then citing *Orzeck v. Englehart*, 195 A.2d 375, 377 (Del. 1963))).

[94] *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180-81 (Del. 2015) ("It is a fundamental principle of contract law that *the parties* to a contract are bound by its terms and have a corresponding right to enforce them." (emphasis added) (citations omitted)); *cf.* Restatement (Second) of Contracts § 302 (Am. L. Inst. 1981) ("Unless otherwise agreed *between promisor and promisee*, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and . . . the circumstances indicate that the promise intends to give the beneficiary the benefit of the promised performance.").

[95] *See* 8 *Del. C.* § 262(i).

as an intended beneficiary of the Refrain Obligation to enforce the Stockholders Agreement, though Authentix need not do so because it was a party to the contract.

**B.     Neither Statutory Law Nor Public Policy Prohibits Authentix from Enforcing the Refrain Obligation Against the Petitioners**

The Petitioners argue that, even if they agreed to a clear waiver of appraisal rights, three provisions of the DGCL prevent Authentix from enforcing the waiver.  First, the Petitioners argue that the Refrain Obligation is a stock restriction that had to be included in the corporation's charter under Section 151(a).[96]   Second, the Petitioners argue that Section 262 prohibits stockholders from agreeing to an *ex ante* waiver of their appraisal rights under a stockholders agreement.[97]   Third, the Petitioners argue that Section 218 prohibits Delaware corporations from enforcing a stockholders agreement with their own stockholders.[98]  The Court addresses each issue below.

**1.     Principles of statutory interpretation**

The principles of statutory interpretation are well-settled.  "Statutory interpretation is a question of law, which we review *de novo*."[99]  "The 'most important consideration for a court in interpreting a statute is [the language] the General Assembly used in writing [the statute].'"[100]  The first step in this analysis is to "determine whether or not the statute is

---

[96] Opening Br. 28-29.

[97] *Id.* at 29-41.

[98] *Id.* at 41-45.

[99] *Salzberg v. Sciabacucchi*, 227 A.3d 102, 112 (Del. 2020) (citing *Corvel Corp. v. Homeland Ins. Co. of N.Y.*, 112 A.3d 863, 868 (Del. 2015)).

[100] *Id.* at 113 (quoting *Boilermakers Loc. 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 950 (Del. Ch. 2013)).

ambiguous."[101]  "[A] statute is ambiguous only if it is reasonably susceptible to different interpretations, or 'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.'"[102]  "The fact that the parties disagree about the meaning of the statute does not create ambiguity."[103]  "If the statute is found to be clear and unambiguous, then the plain meaning of the statutory language controls."[104]  On the other hand, if the statute is ambiguous it will be construed "'in a way that will promote its apparent purpose and harmonize [it] with other statutes' within the statutory scheme."[105]

### 2. The Refrain Obligation is not a stock restriction that must be included in the certificate of incorporation

At the time of adoption, the Stockholders Agreement, including the Refrain Obligation, bound all of Authentix's stockholders and contained a clause purporting to bind their successors, assigns, and transferees.[106]  The Petitioners argue that because the Refrain Obligation applied to all of the outstanding stock in Authentix, it was a "limitation[] or restriction[]" on a class or series of stock that, under DGCL Section 151(a), "shall be stated

---

[101] *Ins. Comm'r of Del. v. Sun Life Ins. Co. of Can. (U.S.)*, 21 A.3d 15, 20 (Del. 2011) (citing *Chase Alexa, LLC v. Kent Cnty. Levy Ct.*, 991 A.2d 1148, 1151 (Del. 2010)).

[102] *Id.* (first citing *Chase Alexa*, 991 A.2d at 1151; and then quoting *Dir. of Rev. v. CAN Hldgs., Inc.*, 818 A.2d 953, 957 (Del. 2003)).

[103] *Id.* (quoting *Chase Alexa*, 991 A.2d at 1151).

[104] *Id.* (citing *Dir. of Rev.*, 818 A.2d at 957); *see also Salzberg*, 227 A.3d at 112 ("The court must 'give the statutory words their commonly understood meanings.'" (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982))).

[105] *Sun Life Ins.*, 21 A.3d at 20 (quoting *Eliason v. Englehart*, 733 A.2d 944, 946 (Del. 1999)).

[106] *See, e.g.*, *Manti I*, 2018 WL 4698255, at *4 ("Here, the corporation determined it was in the corporate interest to entice investment.  It, and its stockholders individually, *all* entered an agreement with the Carlyle Group that was presumably to the benefit of all parties." (emphasis added)).

and expressed in [the corporation's] certificate of incorporation" or in the authorizing board resolutions. Noting that the Refrain Obligation was not so disclosed, the Petitioners claim that the Refrain Obligation is unenforceable because it does not comply with the disclosure requirements of Section 151(a).[107] The Petitioners also argue that allowing Authentix to enforce the Refrain Obligation would render Section 151(a) a nullity because stock restrictions will generally be codified in a written agreement and therefore would not need to be disclosed in the charter or qualifying board resolution.[108]

As the Court of Chancery properly held, the Refrain Obligation is not a stock restriction because the Stockholders Agreement imposed *personal* obligations on the stockholders rather than encumbrances on the property rights that run with the stock. "The parties, including the Company, did not transform the Petitioners' shares of stock into a new restricted class via the S[tockholders] A[greement]; instead, individual stockholders took on contractual responsibilities in return for consideration."[109] Stated differently, the Stockholders Agreement "did not restrict the appraisal rights of the classes of stock held by the Petitioners; instead, the Petitioners, by entering the S[tockholders] A[greement], agreed

---

[107] Opening Br. at 28 (citing *Ellingwood v. Wolf's Head Oil Refining Co.*, 38 A.2d 747, 747 (Del Ch. 1944)).

[108] *Id.* at 29 ("If special rights or limitations . . . related to stock are not set forth in the charter . . . can nonetheless be enforced . . . as long as they are in a separate agreement, there could never be a violation of Section 151(a) because such rights or limitations will always be set forth in writing somewhere . . . .").

[109] *Manti I*, 2018 WL 4698255, at *4.

to forbear from exercising that right."[110]  Thus, "enforcing the S[tockholders] A[greement] is not the equivalent of imposing limitations on a class of stock under Section 151(a)."[111]

Additionally, enforcing the Refrain Obligation against the Petitioners does not implicate the notice-giving public policy concern animating Section 151(a).  This is not a case where a corporation seeks to enforce the Refrain Obligation against a party that did not sign the Stockholders Agreement.  Authentix is only seeking to enforce the Refrain Obligation against sophisticated parties that negotiated and signed the Stockholders Agreement.  The Petitioners can hardly complain about a lack of notice given the facts in this case.  And while the clause purporting to bind successors, assigns, and transferees may be unenforceable,[112] the Stockholders Agreement has a severability clause,[113] and Authentix is not attempting to enforce the Refrain Obligation against any stockholders that did not sign the Stockholders Agreement in exchange for consideration.

Further, the Petitioners' interpretation of Section 151(a) leads to the conclusion that any performance duties imposed under a stockholders agreement binding all of a

---

[110] *Id.*

[111] *Id.*

[112] J.A. 89, at § 13(b) ("Successors, Assigns, and Transferees.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective legal representatives, heirs, legatees, successors and assigns and any other transferee and shall also apply to any securities acquired by a Holder after the date hereof.").

[113] J.A. 91, at § 13(j) ("Severability.  In the event that any one or more of the provisions contained herein, or the application thereof in any circumstance, is held invalid, illegal or unenforceable in any respect for any reason, the validity, legality and enforceability of any such provision in every other respect and of the remaining provisions contained herein shall not be in any way impaired thereby.").

26

corporation's stockholders is a stock restriction, provided that such performance obligations place a burden on the rights that come with owning stock. This result is inconsistent with the language of Section 218(a), which authorizes "[o]ne stockholder or 2 *or more* stockholders" to form a stockholders agreement and does not impose any limitations on the number or percentage of a corporation's stockholders that can form a stockholders agreement.[114] Given Delaware's public policy favoring private ordering,[115] the Court is unwilling to add a total-percentage-of-stockholders limitation to Section 218 where none exists. Accordingly, the Court rejects the Petitioners' argument that any performance duty imposed under a bilateral agreement binding all of a corporation's stockholders is a stock restriction.

Finally, allowing Authentix to enforce the Refrain Obligation against the Petitioners does not render Section 151(a) a nullity. A corporation must still make the necessary disclosures in order to issue stock with restrictions.[116] And holding that the Refrain Obligation is not a stock restriction does not mean that corporations can use stockholders agreements to circumvent the requirements applicable to an actual stock restriction. Accordingly, this Court affirms the Court of Chancery's holding that the Refrain Obligation

---

[114] (emphasis added).

[115] *See, e.g.*, *Salzberg*, 227 A.3d at 116.

[116] To avoid any doubt, the Court does not hold that a Delaware corporation can issue stock that lacks appraisal rights. Rather, the Court holds more narrowly that the Refrain Obligation is not a stock restriction because it imposed personal obligations on the Petitioners.

is not a stock restriction that had to be disclosed in the corporation's charter or the authorizing board resolutions under Section 151(a).

### 3. Sophisticated and informed stockholders can voluntarily agree to waive their appraisal rights in exchange for valuable consideration

Section 262(a) of the DGCL provides that "[a]ny stockholder of a corporation of this State" that meets the predicate requirements for filing an appraisal petition "*shall* be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock."[117] The Petitioners argue that because the General Assembly used the word "shall,"[118] common stockholders have a mandatory right to seek a judicial appraisal that cannot be abrogated in a corporate charter.[119] The Petitioners note that "when evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract," which includes from top to bottom, "(i) the [DGCL], (ii) the corporation's charter, (iii) its bylaws, and (iv) other entity-specific contractual agreements, such as . . . a stockholder agreement."[120] Because the charter is higher up in the corporate hierarchy than a stockholders agreement, the Petitioners conclude that Authentix cannot use the Stockholders Agreement to impose a

---

[117] (emphasis added).
[118] 8 *Del C.* § 262(a).
[119] Opening Br. 29-41.
[120] Opening Br. 35-36 (quoting *Quadrant Structured Prod. Co., Ltd. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014).

limitation that could not be included in the corporation's charter.[121] The Petitioners also warn that allowing Authentix to enforce the Refrain Obligation will invite corporations to use stockholders agreements to alter other mandatory provisions of the DGCL, upsetting the hierarchy of corporate law and blurring the distinctions between corporations and alternative entities.[122]

The Court's discussion of this issue is divided into three parts. The first part discusses how the DGCL reflects Delaware's public policy favoring private ordering. The second part holds that the plain language of Section 262 does not prohibit stockholders from agreeing to an *ex ante* waiver of their appraisal rights. The third part holds that the public policy concerns underlying Section 262 do not prohibit sophisticated and informed stockholders from voluntarily waiving their appraisal rights in exchange for valuable consideration.

### a) The DGCL is a broad enabling act that allows immense freedom for private ordering

"At its core, the [DGCL] is a broad enabling act" that "allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise" "provided the statutory parameters and judicially imposed principles of fiduciary duty are honored."[123] "In fact, 'Delaware's corporate statute is widely regarded

---

[121] *Id.* at 35-36.
[122] *Id.* at 35-41.
[123] *Salzberg*, 227 A.3d at 116 (alteration in original) (italics added) (first quoting *Williams v. Geier*, 671 A.2d 1368, 1381 (Del. 1996); and then citing Edward P. Welch & Robert S. Saunders,

as the most flexible in the nation because it leaves parties to the corporate contract (managers and stockholders) with great leeway to structure their relationships, subject to relatively loose statutory constraints and to the policing of director misconduct through equitable review.'"[124]

This public policy favoring private ordering is reflected in Section 102(b)(1), which allows a corporate charter to contain virtually any provision that is related to the corporation's governance and not "contrary to the laws of this State":

> In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters: (1) Any provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, *and the stockholders*, or any class of stockholders . . .; if such provisions *are not contrary to the laws of this State*.[125]

Section 109(b) provides similarly broad authorization for bylaws that are "not inconsistent with law or with the certificate of incorporation," and which "relat[e] to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers, or employees."

---

*Freedom and Its Limits in the Delaware General Corporation Law*, 33 Del. J. Corp. L. 845, 856-60 (2008)).

[124] *Id.* (quoting *Jones Apparel Grp., Inc. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 845 (Del. Ch. 2004)).

[125] (emphasis added).

Although the DGCL is a broad and enabling statute, "[i]t is not . . . bereft of mandatory terms."[126] For example, "[t]he certificate of incorporation may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim . . . ."[127] Similarly, while a corporate charter may include "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director," the charter may not "eliminate or limit the liability of a director" for breaches of the duty of loyalty, acts of bad faith, or "any transaction from which the director derived an improper personal benefit."[128] In addition to these express prohibitions, corporate charters and bylaws may not contain provisions that are "contrary" to,[129] or "inconsistent" with,[130] Delaware law because they "transgress . . . a public policy settled by the common law or implicit in the General Corporation itself."[131]

> b) **Section 262 does not prohibit stockholders from agreeing to an *ex ante* waiver of their appraisal rights**

The Petitioners argue that because the General Assembly provided that stockholders "shall" have the right to demand a judicial appraisal, Section 262 prohibits common

---

[126] *In re Appraisal of Ford Hldgs., Inc. Preferred Stock*, 698 A.2d 973, 976 (Del. Ch. 1997).

[127] 8 *Del. C.* § 102(f); *see also id.* § 109(b) (imposing the same restriction on bylaws).

[128] *Id.* § 102(b)(7).

[129] *Id.* § 102(b)(1).

[130] *Id.* § 109(b).

[131] *Salzberg*, 227 A.3d at 115-16 (quoting *Sterling v. Mayflower Hotel*, 93 A.2d 107, 118 (Del. 1952)) (citing Edward P. Welch & Robert S. Saunders, *Freedom and Its Limits in the Delaware Corporation Law*, 33 Del. J. Corp. L. 845, 856-60 (2008); *see also Jones Apparel Grp., Inc. v. Maxwell Shoe Co.*, 883 A.2d 837, 843 (Del. Ch. 2004) (same).

stockholders from agreeing to an *ex ante* waiver of their appraisal rights.[132]  The Court

rejects this argument.  The plain language of Section 262 does not prohibit stockholders

from agreeing to waive their appraisal rights.

The General Assembly's use of the word "shall" appears to grant stockholders a

mandatory right to seek a judicial appraisal.[133]  "[W]hen construing [a] statute, 'shall'

generally signals [a] mandatory requirement while 'may' is permissive."[134]  Further, "[t]he

mandatory 'shall' . . . normally creates an obligation impervious to judicial discretion."[135]

Nonetheless, the use of "shall" does not end our analysis because parties can agree to waive

mandatory rights.  For example, in *Graham v. State Farm Mutual Automobile Insurance

Co.*, policyholders argued that an insurance company could not enforce an arbitration clause

because Article 1, Section 4 of the Delaware Constitution provides that "[t]rial by jury *shall*

be as heretofore" and therefore creates a mandatory right that cannot be waived.[136]  The

Court rejected this argument and held that the right to a jury trial "is not absolute" and can

be "waive[d] if the parties so intend."[137]  Similarly, in *Baio v. Commercial Union Insurance

Co.*, the Court held that a party could waive its statutory right to subrogation, explaining that

"our legal system permits one to waive even a constitutional right and, *[a] fortiori*, one may

---

[132] Opening Br. 29-41.

[133] *See* 8 *Del. C.* § 262(a).

[134] *GMG Cap. Invs., LLC v. Athenian Venture P'rs I*, 36 A.3d 776, 782 n.20 (Del. 2012) (citing *Miller v. Spicer*, 602 A.2d 65, 67 (Del. 1991) ("The use of the verb 'shall' in legislation generally connotes a mandatory requirement while the verb 'may' is deemed permissive.").

[135] *Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012).

[136] 565 A.2d 908, 911-12 (Del. 1989) (quoting Del. Const. art. 1, § 4 (emphasis added)).

[137] *Id.* at 912.

waive a statutory right."[138]  Thus, granting stockholders a mandatory right to seek a judicial

appraisal does not prohibit stockholders from alienating that entitlement in exchange for

valuable consideration.[139]

Further, the General Assembly knows how to draft language that prohibits parties

from altering a mandatory provision of the DGCL in a corporation's charter or bylaws.[140]

For example, Section 115 states that "no provision of the certificate of incorporation or the

bylaws may prohibit bringing" "internal corporate claims" "in the Courts of this State."

Similarly, Section 102(f) prohibits charter provisions that attempt to shift fees onto

stockholders litigating internal corporate claims.[141]  Presumably the General Assembly

could draft language prohibiting stockholders from altering a mandatory provision under a

---

[138] 410 A.2d 502, 508 (Del. 1979) (first citing *Mize v. Crose*, 399 F.2d 593 (10th Cir. 1968); then citing *Davis v. Dunbar*, 394 F.2d 754 (9th Cir. 1968); and then citing *Components, Inc. v. W. Elec. Co.*, 267 A.3d 579, 582 (Del. 1970); *see generally Juul Labs, Inc. v. Grove*, 238 A.3d 904, 919 n.15 (Del. Ch. 2020) (collecting cases).

[139] The Petitioners claim that *Graham* is distinguishable because an arbitration clause still allows a party to pursue its cause of action in an adversarial proceeding, whereas the Refrain Obligation completely extinguished the Petitioners' appraisal claims.  Opening Br. 40.  This argument conflates the right that was waived in *Graham*—the right to demand a jury trial—with the underlying cause of action, which was a separate right.  *Graham* supports the proposition that a party can waive a mandatory right created using the word "shall."  Further, assuming that the other relevant criteria are met, Delaware courts will enforce the contractual waiver of a substantive right.  *See, e.g.*, *Baio*, 410 A.2d at 502.

[140] *See, e.g.*, 8 *Del. C.* §§ 102(b)(7), 102(f), 109(b).

[141] 8 *Del. C.* § 102(f) ("The certificate of incorporation may not contain any provision that would impose liability on a stockholder for the attorneys' fees or expenses of the corporation or any other party in connection with an internal corporate claim, as defined in § 115 of this title.").

stockholders agreement if it chose to do so. But Section 262 does not contain any language that prohibits stockholders from waiving their appraisal rights.[142]

Finally, the Petitioners point us to the Court of Chancery's decision in *Ford Holdings*.[143] In *Ford Holdings*, the corporation issued preferred stock that would have a predetermined value in an appraisal proceeding, effectively preventing a holder from getting the Court of Chancery to determine the stock's fair value.[144] The stockholders argued that these provisions were invalid because "appraisal rights are mandated by statute and cannot be eliminated by provisions in the corporate charter or the Designations."[145] In framing the legal issues, the court stated that appraisal rights were among the "mandatory provisions" of the DGCL that "may not be varied by terms of the certificate of incorporate or otherwise."[146] Nonetheless, the court held that the statutory right to seek a judicial appraisal "may be effectively waived in the documents creating the security," provided "that result is

---

[142] Notably, even Sections 115 and 102(f) allow alteration through a stockholders agreement. The synopsis of the bill adopting Section 115 states that "Section 115 is *not intended . . .* to prevent the application of any such provision in a stockholders agreement or other writing signed by the stockholder against whom the provision is to be enforced." *See, e.g.*, *Bonanno v. VTP Hldgs., Inc.*, 2016 WL 614412, at *15 (Del. Ch. Feb. 8, 2016) (quoting Del. S.B. 75 syn., 148th Gen. Assem. (2015)). Similarly, the synopsis to the bill adopting 102(f) provides that "[n]ew subsection (f) is not intended . . . to prevent the application of such [fee-shifting] provisions pursuant to a stockholders agreement or other writing signed by the stockholder against whom the provision is to be enforced." J.A. 2364, at 111. And the General Assembly did not provide that clarification in the statutory text to preserve the rights of stockholders to agree to such restrictions under a bilateral agreement. Thus, the General Assembly appears to have rejected the Petitioners' bright-line rule that a stockholders agreement may not impose any restrictions on stockholders that could not be included in the charter.
[143] Opening Br. 32-34.
[144] 698 A.2d at 978-79.
[145] *Id.* at 975.
[146] *Id.* at 976.

quite clearly set forth when interpreting the relevant document under generally applicable principles of construction."[147]

The Petitioners argue that the Court of Chancery's analysis in *Ford Holdings* was limited to preferred stock and that common stockholders have a mandatory right to seek a judicial appraisal that cannot be waived *ex ante* under a corporation's charter, bylaws, a stockholders agreement, "or otherwise."[148]  As a preliminary matter, the Petitioners rely on *dicta* to support their argument.  *Ford Holdings* addressed whether a corporation could issue *preferred* stock that would have a fixed value in an appraisal proceeding.[149]  This did not ask the court to decide whether common stock could be subject to a similar restriction.  The court's focus on the "essentially contractual nature of preferred stock" did not foreclose the possibility that sophisticated and informed common stockholders, with bargaining power, could agree to waive their appraisal rights in exchange for valuable consideration.[150]

Regardless, the Petitioners' reliance on *Ford Holdings* is misplaced.  It may make good economic sense to treat preferred stock differently from common stock, but Section 262 does not make such a distinction.  To the contrary, Section 262(h) instructs the "Court [of Chancery] [to] take into account *all relevant factors*" when determining fair

---

[147] *Id.* at 977 (citing *Red Clay Educ. Ass'n v. Bd. of Educ.*, 1992 WL 14965, at *7 (Del. Ch. Jan. 16, 1992)).

[148] *Id.* at 976; Opening Br. 32-34.

[149] *See Ford Holdings*, 698 A.2d at 977-79.

[150] *Id.* at 977.

value.[151]  On its face, this instruction applies equally to common stock and preferred stock. Owners of both are entitled to a judicial appraisal.  This statutory language casts doubt on whether it was the contractual nature of preferred stock that made the fixed-value provisions valid, as factors other than the contractual language could have been relevant to determining the preferred stock's fair value.  Thus, we read *Ford Holdings* for the more general principle that a *stockholder* can waive its appraisal rights *ex ante* under certain circumstances.

Additionally, allowing Authentix to enforce the Refrain Obligation against the Petitioners does not raise the concerns about "asymmetrical information and rational apathy on the part of widely disaggregated shareholders of public companies" that *Ford Holdings* identified as possible "explanations" for treating a right as an essential feature of the corporate form that cannot be waived.[152]  The Petitioners were sophisticated and informed investors, represented by counsel, that used their bargaining power to negotiate for funding from Carlyle in exchange for waiving their appraisal rights.[153]  They also comprised all of the stockholders in the closely-held predecessor entity Authentix, Inc.,[154] removing any concerns about rational apathy that might appear in the context of a public company.  And the Refrain Obligation was not a "midstream amendment" that was forced upon the

---

[151] (emphasis added).

[152] *Ford Holdings*, 698 A.2d at 977 n.8 (citing Arye Bebchuk, *Limiting Contractual Freedom in Corporate Law:  The Desirable Constraints on Charter Amendments*, 102 Harv. L. Rev. 1820 (1989)).

[153] *Manti II*, 2019 WL 3814453, at *2.

[154] J.A. 1601-04.

Petitioners without their express consent.[155] Thus, despite being common stockholders, the Petitioners have much in common with the preferred stockholders in *Ford Holdings*.[156]

In short, the Petitioners have failed to identify anything in either Section 262 or *Ford Holdings* that provides a convincing explanation of why preferred stockholders should be able to agree to *ex ante* determination of fair value, which effectively operates as a waiver of their appraisal rights, while sophisticated common stockholders, represented by counsel, that agreed to a clear waiver of appraisal rights for their common stock in exchange for valuable consideration cannot. As the court noted in *Ford Holdings*, "[t]here is no utility in defining as forbidden any term thought advantageous to informed parties, unless the term violates substantive law."[157]

Accordingly, this Court agrees with the Court of Chancery that the plain language of Section 262 does not prohibit Authentix from enforcing the Refrain Obligation.

### c) Public policy concerns do not prohibit sophisticated and informed stockholders from waiving their appraisal rights in exchange for valuable consideration

The question remains, however, whether the Petitioners have identified any other public policy concerns that prevent Authentix from enforcing an appraisal waiver against its own stockholders. The Petitioners claim that allowing Authentix to enforce the Refrain

---

[155] *Ford Holdings*, 698 A.2d at 977 n.8.

[156] *Id.* (opining that the arguments in favor of making terms mandatory to avoid problems of information asymmetry and rational apathy "would have little bite here where, at the formation stage, the preferred have in effect a bargaining agent in the underwriter and no-midstream amendment is implicated.").

[157] *Id.* at 977.

Obligation is against public policy for two main reasons: (1) a stockholder cannot knowingly waive its appraisal rights without knowing the details of the transaction that purportedly pays them less than fair compensation and (2) allowing Authentix to enforce the Refrain Obligation will dilute the corporate "brand" and allow corporations to use stockholders agreements to change all other provisions of the DGCL. We disagree and conclude that allowing Authentix to enforce the Refrain Obligation against the Petitioners does not raise public policy concerns that justify excusing the Petitioners from the bargain that they struck.

First, the Petitioners seem to argue that *ex ante* waivers of appraisal rights are invalid because stockholders cannot *knowingly* waive their appraisal rights without knowing the details of the transaction that purportedly pays them less than fair value.[158] Under Delaware law, a party agreeing to waive a claim must have "knowledge of all material facts," including knowledge of "the requirement or condition" they are agreeing to waive.[159] The Refrain Obligation satisfied these criteria. The Petitioners were sophisticated investors, represented by counsel, that agreed to a clear waiver of their appraisal rights in exchange for valuable consideration.[160] The Stockholders Agreement was not a contract of adhesion;[161] and the Petitioners have not argued that they were ignorant of the Refrain

---

[158] *See, e.g.*, Opening Br. 41; Reply Br. 28.
[159] *Bantum*, 21 A.3d at 50-51.
[160] *Manti II*, 2019 WL 3814453, at *2.
[161] *See* J.A. 1601-04.

Obligation when they signed the contract or that the inclusion of the Refrain Obligation was a mistake. It also would have been easy for the Petitioners to predict the circumstances in which the Refrain Obligation would be invoked, namely, Carlyle and the board might approve a merger agreement that the Petitioners think pays them unfair compensation for their cancelled stock.

Further, this framing of the knowledge requirement would render nearly all arbitration clauses invalid or useless. If a party needs full knowledge of a claim to agree to a knowing waiver, then *ex ante* waivers of the right to demand a jury trial are invalid. This result conflicts with how Delaware courts treat arbitration clauses.[162] Accordingly, we reject the Petitioners' suggestion that they lacked sufficient knowledge to waive their appraisal rights.

Second, the Petitioners argue that "[t]here is no policy need to permit alteration of the DGCL's mandatory rights to ensure maximum freedom of contract for corporations because there are other Delaware entities," such as LLCs, "that already permit such freedom."[163] "By branding itself a Delaware corporation, a firm signals that it 'has certain core characteristics that provide basic protections to investors.' One of those characteristics is the right to appraisal; but if these core characteristics can be eliminated *ex ante* . . ., the

---

[162] *See, e.g.*, *Graham*, 565 A.2d at 911-12 (holding that insurance policyholders could waive their right to a jury trial under an arbitration clause before the policyholders had knowledge of a ripe claim to bring against their insurer).

[163] Opening Br. 41 (citing 6 *Del. C.* § 18-1101(b) ("It is the policy of this chapter to give the maximum effect to the principles of freedom of contract . . . .")).

value of the brand is lost."[164] It is important to preserve the fundamental characteristics of the corporate form. Parties wishing to deviate from those characteristics can choose to form an alternative entity, which prioritizes the freedom of contract over mandatory provisions.[165] Additionally, prohibiting the waiver or alteration of a provision of the DGCL has the benefit of promoting transparency and standardization, as prospective investors will not need to investigate whether that provision has been altered and can rely on existing case law to predict how Delaware courts will treat a corporation's actions.

The trouble with this argument, however, is that it provides an incomplete framework for determining whether stockholders can waive a right. In fact, if the goal is to remove any doubt about the features of the corporate form, all provisions of the DGCL should be mandatory. The best way to save investors the trouble of determining whether a corporation departed from a default rule would be to make that rule mandatory, or to make that rule mandatory unless the General Assembly expressly allows alteration. But this result would conflict with the flexibility that the General Assembly provided under Sections 102(b)(1) and 109(b), both of which provide broad authority for corporations to adopt charter provisions and bylaws that are not contrary to Delaware law.[166] If all

---

[164] *Id.* (quoting Edward P. Welch & Robert S. Saunders, *Freedom and Its Limits in the Delaware General Corporation Law*, 33 Del. J. Corp. L. 845, 865-67 (2008)).

[165] *See* 6 *Del. C.* § 18-1101(b).

[166] 8 *Del. C.* § 102(b)(1) (allowing the charter to contain "[a]ny provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of stockholders . . . if such provisions are not contrary to the laws of this State."); *id.* § 109(b) ("The bylaws may contain any provision, not inconsistent with law or

provisions are mandatory unless expressly stated, the discretion-granting language in Sections 102 and 109 would serve no purpose, as it would be the language of the statutory section being altered that would allow for alteration, not the more general Sections 102 and 109.[167] This result is contrary to the Court's recognition that "[a]t its core, the [DGCL] is a broad enabling act."[168]

This brings us to the real crux of Petitioners' argument. Appraisal rights are core characteristics of the corporate entity that provide basic protections to investors; as such they cannot be waived—at least *ex ante*—under a bilateral agreement. Thus, we look to the fundamental nature of appraisal rights to determine whether stockholders can agree to an *ex ante* waiver.

As the Dissent recognizes, "before the Delaware appraisal statute was enacted, no consolidation or merger of corporations could be effected except with the consent of all the stockholders."[169] This unanimity "scheme proved unworkable 'since one or more minority stockholders, if he or they desired to do so, could impede the action of all the other stockholders.'"[170] Thus, the Delaware General Assembly amended the law "to allow the sale of a corporation upon the consent of a majority of its stockholders."[171] "Given that a

---

with the certificate of incorporation, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.").

[167] *Maxwell*, 883 A.2d at 848.

[168] *Salzberg*, 227 A.3d at 116 (citation omitted).

[169] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1133 (Del. 2020).

[170] *Id.* (quoting *Schenley Indus., Inc. v. Curtis*, 152 A.2d 300, 301 (Del. 1959).

[171] *Id.*

single shareholder could no longer hold up the sale of a company, the General Assembly devised appraisal in service of the notion that 'the stockholder is entitled to be paid for that which has been taken from him.'"[172] Appraisal rights therefore allow dissenting stockholders to seek fair compensation for property taken without consent.[173]

The Dissent states that in addition to providing fair compensation, appraisal claims impose a check on corporate transactions at an unfair price. Thus, the right to demand a judicial appraisal is a fundamental feature of the corporate form because appraisal claims regulate the balance of power between Delaware corporations and their constituencies.[174] We acknowledge that the availability of appraisal rights might theoretically discourage attempts to pay minority stockholders less than fair value for their cancelled stock.[175] Nonetheless, the focus of an appraisal proceeding is paying fair value for the petitioner's stock,[176] not policing misconduct or preserving the ability of stockholders to participate in

---

[172] *Id.* (quoting *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 19 (Del. 2017)).

[173] *See, e.g.*, *Francis I. DuPont & Co. v. Universal City Studios, Inc.*, 343 A.2d 629, 634 (Del. Ch. 1975) ("The power of a stockholder majority to override minority dissenters and remit them to the cash appraisal remedy is 'analogous to the right of eminent domain.'" (citations omitted)).

[174] *Id.* at 20.

[175] *See, e.g.*, Reply Br. 23 ("The public policy behind inviolate appraisal rights has even greater significance for stockholders of private companies—like Petitioners—who lack a robust market for their shares." (citing Cornerstone Research, *Appraisal Litigation in Delaware: Trends in Petitioners and Opinions 2016-2018*, at 9 (2019), https://www.cornerstone.com/publications/reports)).

[176] *See, e.g.*, 8 *Del. C.* § 262(a) (providing that a stockholder meeting certain criteria "shall be entitled to an appraisal by the Court of Chancery *of the fair value* of the stockholder's shares of stock . . . ." (emphasis added)); *In re Solera*, 240 A.3d at 1133 ("[A]ppraisal 'is a limited legislative remedy developed initially as a means to compensate shareholders of Delaware corporations for the loss of their common law right to prevent a merger or consolidation by refusal

corporate governance.[177]  Granting stockholders the individual right to demand fair value does not prohibit stockholders from bargaining away that individual right in exchange for valuable consideration.  And while the availability of appraisal rights may deter some unfair transactions at the margins, we are unconvinced that appraisal claims play a sufficiently important role in regulating the balance of power between corporate constituencies to forbid sophisticated and informed stockholders from freely agreeing to an *ex ante* waiver of their appraisal rights under a stockholders agreement in exchange for consideration.

Further, Section 262(g) provides a *de minimis* exception from appraisal rights for stockholders of publicly-traded corporations.  If appraisal rights are sacrosanct to the corporate form, it would make little sense for the General Assembly to adopt this exception, which "removed appraisal rights for the most disempowered shareholders."[178]  And if

---

to consent to such transactions.'  As such, we have said that '[t]here is one issue in an appraisal trial: "the value of the dissenting stockholder's stock."'" (second alteration in original) (first quoting *Ala. By–Prods. Corp. v. Cede & Co.*, 657 A.2d 254, 258 (Del. 1995); and then quoting *Dell*, 177 A.3d at 19) (citing *Applebaum v. Avaya*, 812 A.2d 880, 893 (Del. 2002))); *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182, 1186 (Del. 1988) (The purpose of appraisal rights is to "provide shareholders dissenting from a merger on grounds of inadequacy of the offering price with a judicial determination of the intrinsic word (fair value) of their shareholders.").

[177] Some scholars argue that appraisal rights indirectly police misconduct by deterring offers that would pay minority stockholders unfair compensation for their stock, particularly for private firms.  *See, e.g.*, Jill E. Fisch, *Stealth Governance:  Shareholder Agreements and Private Ordering*, Faculty Scholarship at Penn Law 2199, at (Mar. 1, 2021) ("The problem with analyzing shareholder agreements as personal waivers, as the *Manti* court did, is that a shareholder's corporate governance rights affect the interests of other shareholders as well as the rights and responsibilities of the corporation's officers, directors and non-shareholder stakeholders. . . . An agreement to forsake appraisal rights affects the terms of future transactions."), https://scholarship.law.upenn.edu/faculty_scholarship/2199.  Nonetheless, the Court views such indirect policing as an ancillary benefit and not the focus of Section 262.

[178] *See, e.g.*, Jill E. Fisch, *A Lesson from Startups:  Contracting Out of Shareholder Appraisal*, Faculty Scholarship at Penn Law 2198, at 45 (Mar. 1, 2021) ("Delaware amended its appraisal statute in 2016 to require that a minimum of 1% of the outstanding shares petition for appraisal.

adopted, the Petitioners' position would also cast doubt on whether drag-along rights are enforceable. Under Section 262(a), a stockholder that "voted in favor of the merger or consolidation," or who provided written consent as provided for under Section 228, forfeits its appraisal claim. Drag-along rights often require that minority stockholders take actions that are reasonably necessary to close a merger, which would presumably include voting in favor of the merger or providing written consent.[179] If a stockholder cannot waive its appraisal rights directly, there is no reason why a stockholder should be able to waive its appraisal rights indirectly by agreeing to a performance obligation that would require them to approve a merger.

Additionally, allowing Authentix to enforce the Refrain Obligation against the Petitioners does not implicate other public policy concerns that might be present in different bargaining contexts. For example, if Authentix attempted to enforce the Refrain Obligation against a retail investor that was not involved in negotiating the Stockholders Agreement— or against outsiders that lack material knowledge of Authentix's corporate governance dynamics—concerns about information asymmetry might justify excusing enforcement.

---

This de minimis exception removed appraisal rights for the most disempowered shareholders, undercutting the argument that appraisal rights are a critical source of minority shareholder protection." (citations omitted)), https://scholarship.law.upenn.edu/faculty_scholarship/2198.

[179] *See generally SV Inv. P'rs, LLC v. ThoughtWorks Inc.*, 7 A.3d 973, 991-92 (Del. Ch. 2010) ("Another alternative, common in stockholders' agreements, allows a preferred stockholder to sell its security and 'drag along' the remaining stockholders. 'Drag along' rights, which effectively allow a preferred stockholder to sell the entire company to a third party without board involvement, are quite common. A similar but stronger provision requires the forced sale of the company to the preferred stockholder.").

But that is not this case. The Petitioners were sophisticated and informed investors, represented by counsel, that used their bargaining power to negotiate a waiver of their appraisal rights in exchange for valuable consideration.[180] The Petitioners were also the sole stockholders of the predecessor entity—Authentix, Inc.—before Carlyle entered the picture and were therefore insiders for the purpose of negotiating the Stockholders Agreement.[181] There is no suggestion that Carlyle coerced the Petitioners into waiving their appraisal rights, that the Petitioners did not know that the Stockholders Agreement contained the Refrain Obligation, or that Carlyle had any secret knowledge when it negotiated the Stockholders Agreement. Stated differently, the Petitioners were sophisticated insiders with access to all the information that they could need to understand the Refrain Obligation's value and cost. These capable investors do not need protection of the courts to escape a bad bargain.

Similarly, allowing Authentix to enforce the Refrain Obligation against the Petitioners does not raise the concerns about a lack of consent that might be present had the board or a subset of stockholders adopted the Refrain Obligation, or if Authentix was trying to enforce a contract of adhesion against a stockholder that lacked bargaining power. Authentix is seeking to enforce the Refrain Obligation against stockholders that specifically assented to the Stockholders Agreement. Those stockholders were represented by counsel

---

[180] *Manti II*, 2019 WL 3814453, at *2.
[181] J.A. 1601-04.

45

and had negotiating leverage. There is no basis to question that the Petitioners freely and knowingly consented to waive their appraisal rights in exchange for valuable consideration.

Finally, throughout their papers, the Petitioners frame the Refrain Obligation as something that Authentix imposed upon its stockholders.[182] This framing is inaccurate. The Refrain Obligation is not a performance obligation that Authentix unilaterally foisted upon the Petitioners. The Refrain Obligation is a concession that the Petitioners voluntarily agreed to make in exchange for obtaining valuable funding from Carlyle. Thus, this case is about whether sophisticated and informed parties, represented by counsel and with the benefit of bargaining power, can freely agree to alienate their appraisal rights *ex ante* in exchange for valuable consideration. The answer to that question is yes.

The Petitioners warn that this holding will have broad and negative implications, effectively rendering all provisions of the DGCL permissive and endorsing waivers of other stockholder rights that may be fundamental to the corporate form.[183] Allowing Authentix

---

[182] *See, e.g.*, Opening Br. 4 ("This is not a question of a knowing waiver in the face of a live transaction, nor a question of what stockholders can do to each other by private agreement; it is a question of corporate authority and what corporations can do to their own stockholders."); *id.* at 36 ("There is no authority in the DGCL or case law for a corporation to modify stockholder rights . . . simply by putting the modification in a stockholders agreement . . . and not denominating it a 'certificate' . . . in order to circumvent the Delaware corporate hierarchy."); *id.* at 45 ("There is no authority for a Delaware corporation to enter into and enforce a stockholders agreement for its own benefit and against its own stockholders . . . .").

[183] *See, e.g.*, Opening Br. 37 ("Under the trial court's approach, whether a provision of the DGCL is mandatory or permissive is irrelevant so long as the corporation acts by separate agreement. By that logic, a corporation could enter into an agreement with all stockholders entitled 'Governing Agreement (Charter Disclaimed) Among Corporation and Stockholders' and each stockholder signatory would be bound to abide by its terms, even if it disclaimed all mandatory provisions of the DGCL.").

to enforce this Refrain Obligation against these Petitioners does not mean that all *ex ante* waivers of appraisal rights are enforceable or that the waiver of any other stockholder right would be enforceable. To the contrary, there are other contexts where an *ex ante* waiver of appraisal rights would be unenforceable for public policy reasons.

Similarly, there may be other stockholder rights that are so fundamental to the corporate form that they cannot be waived *ex ante*, such as certain rights designed to police corporate misconduct or to preserve the ability of stockholders to participate in corporate governance. Allowing Authentix to enforce the Refrain Obligation against the Petitioners does not mean that the *ex ante* waiver of all other stockholder rights would be enforceable.

The Petitioners have failed to identify policy concerns that would justify stopping Authentix from enforcing the Refrain Obligation against the Petitioners under the facts of this case.

### 4. Delaware corporations can enforce stockholders agreements

Section 218(c) authorizes "2 or more stockholders" of a Delaware corporation to form a voting agreement:

> An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.

47

The Petitioners argue that because Section 218(c) only mentions "stockholders," it does not authorize *corporations* to enter into a voting agreement.[184]  Noting that there was uncertainty about whether stockholders agreements were enforceable under common law, the Petitioners claim that Authentix cannot enforce the Stockholders Agreement because the General Assembly did not authorize *corporations* to enforce such agreements.[185]

This argument misses the mark for several reasons.  First, the uncertainty under the common law was about whether *voting trusts* were illegal because they separated ownership from voting rights.[186]  The Stockholders Agreement does not assign voting rights to someone other than the stock's owner.  Rather, it is an agreement between stockholders to vote *their shares* consistent with terms to which the parties mutually agreed.[187]  Thus, the Stockholders Agreement lacks the fundamental characteristic that raised doubts about whether voting trusts were enforceable under common law.

Additionally, nothing in the language of Section 218 prohibits corporations from entering into stockholders agreements.  Forming contracts is a core corporate power.[188]

---

[184] Opening Br. 41-45.

[185] *Id.*

[186] *See, e.g.*, *Oceanic Expl. Co. v. Grynberg*, 428 A.2d 1, 6-7 (noting that the separation of ownership from voting rights is both the defining feature of a voting trust and the characteristic that cast doubt on whether such agreements are enforceable).

[187] *See, e.g.*, J.A. 73-74, at § 3(e) (imposing restrictions on the minority stockholders to vote *their own shares* consistent with the terms of the Stockholders Agreement).

[188] *See, e.g.*, 8 *Del. C.* § 122(13) (authorizing corporations to "[m]ake contracts").

Thus, given Delaware's public policy respecting private ordering,[189] the Petitioners have failed to provide a strong reason for this Court to construe Section 218 to prohibit corporations from entering into a stockholders agreement drafted and negotiated by sophisticated stockholders represented by counsel. Things might be different if, for example, a corporation's board or officers used a stockholders agreement to perpetuate themselves in office. But that concern is not present here.[190]

Accordingly, this Court affirms the Court of Chancery's holding that Section 218 does not prohibit a Delaware corporation from enforcing a stockholders agreement.

---

[189] *See, e.g.*, *Salzberg*, 227 A.3d at 116 ("At its core, the [DGCL] is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored." (quoting *Williams*, 671 A.2d at 1381)).

[190] For the same reasons, the Court of Chancery's opinion in *Insituform of North America v. Chandler* is inapposite. 534 A.2d 257 (Del. Ch. 1987). In *Insituform*, the court suggested that corporations might not have standing to contest an election under DGCL Section 225 because the statute—as it was written at that time—did not expressly grant corporations standing. *Id.* at 270, n.11; *see* Del. S.B. 244, 144th Gen. Assem., 2008 Delaware Laws Ch. 252 (amending Section 225 to expressly confer standing upon corporations). The court's concern seems to have been based, however, on the public policy concerns underlying DGCL Section 160(c), which prohibits a corporation from voting its own stock in an effort to "prevent those in control of a corporation from using corporate resources to perpetuate themselves in office." *Insituform*, 534 A.2d at 270, n.12 (citing *Speiser v. Baker*, 525 A.2d 1001 (Del. Ch. 1987)). That concern is not present here because enforcing the Refrain Obligation did not allow any directors to perpetuate themselves in office. To the contrary, the merger agreement allowed an outsider to gain control of Authentix. *See, e.g.*, *Manti II*, 2020 WL 4596838, at *1 (noting that the 2017 merger sold Authentix to a third-party). Additionally, the General Assembly did not need to list corporations in Section 218 to grant corporations the authority to enforce a stockholders agreement. DGCL Section 122(13) already grants corporations with the power to form and enforce contracts.

**C. The Court of Chancery Did Not Abuse Its Discretion by Awarding the Petitioners Equitable Interest on the Merger Consideration**

The Court of Chancery awarded the Petitioners equitable interest on their portion of the merger consideration.[191] The court explained that because the Appraisal Petition raised several novel questions of corporate law, Authentix was able to hold onto funds belonging to the Petitioners for a long period of time while the court resolved the dispute.[192] Thus, the court found that equity required awarding the Petitioners interest at the statutory rate, but based on the court's *equitable* power to fashion an appropriate remedy:

> The Petitioners were stockholders in an entity. Through the 2017 Merger, the merger consideration became available to the Petitioners. Nonetheless, they had significant questions regarding their contractual and statutory rights, and in good faith tested those rights by filing an appraisal petition. The litigation required the resolution of several novel issues at the intersection of contract and corporate law and has been lengthy.
>
> The equities of the situation are this: the Petitioners were stripped of their stock and entitled to consideration therefore from the time of the 2017 Merger. These funds of the Petitioners have been held by [Authentix] for the duration of this now-lengthy action. It would, to my mind, be inequitable not to award interest on that amount. It is within this Court's discretion to award such interest. Therefore, and regardless of whether 8 *Del. C.* § 262(h) applies, I find that interest at the legal rate applies to the 2017 merger consideration from the date of the merger.[193]

---

[191] *Manti III*, 2020 WL 4596838, at *10
[192] *Id.*
[193] *Id.* (citations omitted) (formatting altered).

Authentix argues that the Court of Chancery erred by awarding the Petitioners interest on the merger consideration because they "did not assert a claim to the merger consideration in any pleading."[194]  Authentix claims that "[w]ithout the benefit of legal pleadings . . . [it] had no notice as to whether [the] Petitioners were seeking an award of the merger consideration on legal or equitable grounds."[195]  Further, Authentix argues that the award of interest was contrary to the provision of the merger agreement stating that the cancelled stock "shall be . . . converted . . . into . . . the merger consideration . . . *without any interest* thereon . . . ."[196]  Finally, Authentix argues that there was no equitable basis to award interest because the Petitioners caused their own misfortune by filing the Appraisal Petition instead of accepting the merger consideration, and that Authentix did not benefit from holding the funds belonging to the Petitioners because those funds were deposited in a non-interest-bearing account.

The Petitioners raise several arguments in defense of the Court of Chancery's analysis.  For example, the Petitioners claim that they did not need to plead a claim for the merger consideration to provide adequate notice because *Authentix* asked the court to "direct [the] Petitioners to . . . accept the Merger consideration for [their] shares . . . ."[197]  The Petitioners also argue that they were entitled to interest as a matter of right because they

---

[194] Answering Br. 53.

[195] *Id.* at 54.

[196] J.A. 506, at § 3.8.

[197] J.A. 154.

were entitled to receive the merger consideration, and that Delaware courts have used their equitable powers to award interest under similar circumstances where a stockholder failed to perfect its appraisal claim and was therefore forced to settle for the amount of the merger consideration.

This Court reviews for abuse of discretion the Court of Chancery's award of equitable interest.[198] The Court of Chancery has broad equitable authority to award pre-judgment interest, including to a party that did not prevail in the litigation.[199] The "court may grant such relief as the facts of a particular case may require even if the prevailing party has not demanded such relief in its pleadings."[200] On at least one occasion, the Court of Chancery has suggested that a stockholder could receive equitable interest on merger consideration despite failing to perfect its appraisal claim.[201]

---

[198] *See, e.g.*, *Boush*, 1998 WL 40220, at *2 ("[W]e review the [Court of Chancery's] decision to award . . . equitable interest . . . for abuse of discretion." (citing *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 117 (Del. 1992))).

[199] *See, e.g.*, *Hayward v. Green*, 88 A.2d 806, 810-13 (Del. 1952) (affirming the Court of Chancery's equitable award of interest to the defendant, who was not the prevailing party at trial and did not have a contractual right to interest); *ReCor Med., Inc. v. Warnking*, 2015 WL 535626, at *1 (Del. Ch. Jan. 30, 2015) ("The Court [of Chancery] 'has broad discretion, subject to principles of fairness' in awarding interest." (quoting *Valeant Pharms. Int'l v. Jerney*, 921 A.2d 732, 756 (Del. Ch. 2007))).

[200] *Boush v. Hodges*, 705 A.2d 242, 1998 WL 40220, at *2 (Del. Jan. 15, 1998) (TABLE) (first citing Ch. Ct. R. 54(c); and then citing *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (1983)).

[201] *See Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *6 (Del. Ch. Oct. 20, 2014) (opining that despite the stockholders' failure to perfect their appraisal claim, "[t]he remedy for [the defendant's] failure to pay the cash portion [of the merger consideration] is relatively straightforward: damages equal to the amount of the cash portion *plus an award of pre- and post-judgment interest* running from . . ., the day after the 120-day [appraisal petition] filing period ran, until the date of payment." (emphasis added)); *see also Brandywine Smyrna, Inc. v. Millennium Builders, LLC*, 34 A.3d 482, 485 (Del. 2011) ("[I]nterest is awarded in Delaware as a matter of right and not of judicial discretion." (quoting *Moskowitz v. Mayor and Council of*

Although we might reach a different result on *de novo* review, this Court holds that the Court of Chancery did not abuse its discretion by awarding the Petitioners equitable interest on the merger consideration. As noted above, the Court of Chancery has broad discretion to fashion an appropriate remedy. Regardless of whether the Petitioners pled a claim for the merger consideration in the alternative, *Authentix* recommended that the Court resolve the Appraisal Petition by ordering the Petitioners to accept the merger consideration. This suggestion raised the question of whether the Petitioners should receive interest on their portion of the merger consideration. And the Petitioners could not accept the merger consideration until the court decided the many novel issues of corporate and contractual law the Appraisal Petition raised. Finally, although the merger consideration was deposited in a non-interest-bearing account, the fact remains that the Petitioners were deprived of the beneficial use of their property for an extended period of time to resolve a dispute regarding a merger agreement to which they did not agree, and that Authentix—along with Carlyle and the acquirer—had the power to choose and control where the funds belonging to the Petitioners were deposited. Given the totality of these circumstances, the Court of Chancery did not abuse its discretion by holding that fairness required awarding the Petitioners interest on their portion of the merger consideration.

---

*Wilm.*, 391 A.2d 209, 210 (Del. 1978)); *Boush v. Hodges*, 705 A.2d 243, 1998 WL 40220, at *2 (Del. Jan. 15, 1998) ("The law is that where a court of equity in its sound discretion finds that justice requires interest, it is the duty of that court to allow interest." (quoting *Hayward v. Green*, 88 A.2d 806, 810 (1952)).

**D.     The Court of Chancery Properly Denied Authentix's Request for Pre-Judgment Interest on Attorneys' Fees**

Under Section 13(i) of the Stockholders Agreement, the prevailing party in litigation "involving the . . . enforcement of the rights or obligations of the Parties" has the right to recover reasonable attorneys' fees and expenses (the "Fee-Shifting Provision"):

> (i)     Attorney's Fees.  In the event of any litigation or other legal proceeding involving the interpretation of this Agreement or enforcement of the rights or obligations of the Parties, the prevailing Party or Parties shall be entitled to recover reasonable attorney's fees and expenses in addition to any other available remedy.[202]

The Court of Chancery held that Authentix could recover fees under the Fee-Shifting Provision but was not entitled to pre-judgment interest.[203] Authentix argues that this holding was erroneous because it was wrongfully deprived of the beneficial use of the funds it spent to defend against the Appraisal Petition before the Court of Chancery granted summary judgment against the Petitioners.[204] Authentix also argues that it was inappropriate to award the losing party interest on the merger consideration while denying the prevailing party interest on the attorneys' fees owed under the Fee-Shifting Provision.[205]

The Court of Chancery properly rejected Authentix's request for pre-judgment interest.  Under the plain language of the Fee-Shifting Provision, the Petitioners were not

---

[202] J.A. 91, at § 13(i).
[203] *Manti III*, 2020 WL 4596838, at *5-9.
[204] Answering Br. 57-59.
[205] *Id.*

liable for attorneys' fees unless and until Authentix became the prevailing party.[206] Authentix became the prevailing party when the Court of Chancery granted summary judgment against the Petitioners, and nothing in the Fee-Shifting Provision allowed for pre-judgment interest. Thus, Authentix is asking for an award of pre-judgment interest under a contractual provision that does not provide that remedy.

The language in the Fee-Shifting Provision preserving "any other available remedy" does not change the analysis.[207] Apart from enforcing the Fee-Shifting Provision, Authentix does not claim that it has another path to recovering its attorneys' fees. And for the reasons provided above, the Petitioners could not have breached the Fee-Shifting Provision before the Court of Chancery dismissed the Appraisal Petition. The case law Authentix cites is inapposite for the same reason. In each of those cases, pre-judgment interest was owed because the obligation to indemnify arose *before* the party seeking fees became the prevailing party,[208] or the court awarded pre-judgment interest to a party that prevailed on its affirmative claim.[209] This is not true of the Fee-Shifting Provision, and the Court is unwilling to add language to which the parties did not agree.

---

[206] *See* J.A. 91, at § 13(i).

[207] *See id.*

[208] *See, e.g.*, *Underbrink v. Warrior Energy Servs. Corp.*, 2008 WL 2262316, at *19 (Del. Ch. May 30, 2008) ("A party seeking advancement is entitled to interest from the date on which the party 'specified the amount of reimbursement demanded and produced his written promise to pay.'" (quoting *Citadel Hldg. Corp. v. Roven*, 603 A.2d 818, 826 n. 10 (Del. 1992))).

[209] *See, e.g.*, *Trans World Airlines Inc. v. Summa Corp.*, 1987 WL 5778, at *1 (Del. Ch. Jan. 21, 1987), *aff'd*, 540 A.2d 403 (Del. 1988) (awarding the *plaintiff* pre-judgment interest after the plaintiff prevailed at trial).

Finally, the Court rejects Authentix's disparate treatment argument. Whether the Petitioners were entitled to equitable interest on their portion of the merger consideration has no bearing on whether Authentix had a *contractual* right to pre-judgment interest under the Fee-Shifting Provision. The former is a question of the Court of Chancery's broad equitable power to fashion an appropriate remedy. The latter is a question of the objective intent of the bargain the parties struck. These are separate issues. Accordingly, this Court affirms the Court of Chancery's holding that the plain meaning of the Fee-Shifting Provision did not grant Authentix pre-judgment interest on its attorneys' fees.

## IV. CONCLUSION

For the reasons provided above, the Court affirms the Court of Chancery's judgment.

**VALIHURA, J.**, dissenting:

Appellants/Cross-Appellees Manti Holdings, LLC, and other common stockholders (collectively, "Petitioners") in the predecessor entity to Appellee/Cross-Appellant Authentix Acquisition Co. ("Authentix") sought appraisal. The parties do not dispute that the merger is one that would give rise to statutory appraisal rights, nor that Petitioners took those actions necessary to perfect appraisal rights. Instead, the Court of Chancery found that the appraisal remedy was unavailable because a stockholders agreement (the "Stockholders Agreement") obligated Petitioners to refrain from seeking it. From that conclusion, the trial court held that the contractual obligation barred the appraisal remedy.

To reach this holding, the trial court necessarily had to find that pursuing the appraisal remedy would breach a provision of the Stockholders Agreement and that the provision at issue is enforceable. The second of these inquiries -- whether a stockholders agreement preemptively waiving appraisal rights *ex ante* and which binds all of its stockholders and governs all of its stock is enforceable under the DGCL -- is a difficult and important question of Delaware corporate law.[1] Recognizing the importance of the inquiry, the Court of Chancery issued a second opinion in response to Petitioners' Motion for Reargument expounding on that single question. The Court of Chancery's holding is

---

[1] Petitioners point out that "whether a stockholder can waive a mandatory right in connection with a specific transaction -- *i.e.,* a 'knowing' waiver or relinquishment -- is not the issue here. The issue is whether such rights can be eliminated *ex ante*." Op. Br. at 32. They emphasize that "[t]his is not a question of a knowing waiver in the face of a live transaction; nor a question of what stockholders can do to each other by private agreement; it is a question of corporate authority and what corporations can do to their own stockholders." Op. Br. at 4. I agree.

57

significant because it is the first time a Delaware court has held that a contractual provision in a *stockholders agreement* barring *common* stockholders from exercising their statutory appraisal rights under 8 *Del. C.* § 262 is enforceable as a matter of law.[2]

The Court of Chancery held in *In re Appraisal of Ford Holdings, Inc. Preferred Stock*[3] that the appraisal right set forth in Section 262 is "mandatory."[4] Nevertheless, it also held that the *fair value* of preferred stock could be set by contract.[5] But Chancellor Allen was careful to caution that "preferred stock is a very special case."[6] The Court of Chancery specifically addressed only "whether purchasers of preferred stock can, in effect, contract away their rights to seek judicial determination of the fair value of their stock, by accepting a security that explicitly provides either a stated amount or a formula by which an amount to be received in the event of a merger is set forth."[7] I submit that the setting of the value in a certificate of designations is not truly a waiver of Section 262 rights, but rather, "the amount so fixed or determined constitutes the 'fair value' of the stock for the purposes of dissenters' rights under Section 262."[8]

---

[2] *Manti Holdings, LLC v. Authentix Acq. Co.* (*Manti I*), 2018 WL 4698255, at *1–2 (Del. Ch. Oct. 1, 2018).

[3] 698 A.2d 973 (Del. Ch. 1997).

[4] *Id.* at 976.

[5] *Id.* at 977 ("All of the characteristics of the preferred are open for negotiation; that is the nature of the security.").

[6] *Id.* ("[P]referred stock is a very special case . . .. To the extent it possesses any special rights or powers and to the extent it is restricted or limited in any way, the relation between the holder of the preferred and the corporation is contractual.").

[7] *Id.* at 976.

[8] *Id.* at 974. *See also Shiftan v. Morgan Joseph Holdings, Inc.*, 57 A.3d 928, 942 (Del. Ch. 2012) ("As a general rule, preferred stock has the same appraisal rights as common stock, but '[u]nlike

The Majority opinion affirming the Court of Chancery's decision in this case allowing for modification of statutory governance rights *ex ante* in a stockholders agreement gives me pause. I will set forth three reasons for my concern.

I. *The Stockholders Agreement Fails to Clearly and Unambiguously Indicate the Refrain Objection Survives Termination.*

First, I do not think the Stockholders Agreement has the requisite clarity to effectuate such a waiver. I leave aside for the moment the question of whether an *ex ante* waiver of appraisal rights via a stockholders agreement is enforceable as a matter of Delaware statutory law and public policy. Even if such a provision were legally permissible and not violative of public policy, such a waiver would need to be unequivocally and unquestionably clear.[9] Waivers of statutory provisions must also be

---

common stock, the value of preferred stock is determined solely from the contract rights conferred upon it in the certificate of designation.' Therefore, when determining the fair value of preferred stock, the court must consider the contract upon which the preferred stock's value was based.") (alteration in original) (footnote omitted) (quoting *In re Appraisal of Metromedia Int'l Grp.*, 971 A.2d 893, 900 (Del. Ch. 2009), *modified on other grounds after rearg.*, 2009 WL 1509182 (Del. Ch. May 28, 2009)); *id.* at 932 ("In the case of an appraisal of preferred stock, therefore, the court must look at the contract rights granted to the shares being appraised under the relevant certificate of incorporation or designation in determining fair value.").

[9] *See, e.g., Dirienzo v. Steel P'rs Holdgs. L.P.*, 2009 WL 4652944, at *4 (Del. Ch. Dec. 8, 2009) ("A waiver may be express or implied, but either way, it must be unequivocal.") (citing *Rose v. Cadillac Fairview Shopping Ctr. Props. (Del.) Inc.*, 668 A.2d 782, 786 n.1 (Del. Super. 1995)); *see also Bantum v. New Castle Cty. Vo-Tech Educ. Ass'n*, 21 A.3d 44, 50 (Del. 2011) ("'the facts relied upon to prove waiver must be unequivocal'") (alteration omitted) (quoting *AeroGlobal Cap. Mgmt., LLC v. Cirrus Indus. Inc.*, 871 A.2d 428, 444 (Del. 2005)). In *Ford Holdings*, Chancellor Allen recognized that, absent "[c]lear and direct drafting," in a case involving appraisal rights for preferred shareholders, "the court may not cut stockholders off from a statutory right." 698 A.2d at 979.

unambiguous.[10]  If language is susceptible to more than one reasonable interpretation, then it is ambiguous.[11]  It follows that our interpretive canons require that waivers of statutory rights, if they are valid at all, be strictly construed.[12]

The Refrain Obligation does not satisfy these high bars.  For one thing, the Refrain Obligation conflicts with the Termination Provision.  Section 3(e) of the Stockholders Agreement sets forth the Refrain Obligation.  That section reads, in relevant part:

> [I]n the event that . . . a Company Sale is approved by the Board and . . . the Carlyle Majority, each Other Holder shall consent to and raise no objections against such transaction, and if any such transaction is structured as a sale of Equity Securities, each Other Holder shall take all actions that the Board and/or the applicable Carlyle Stockholders reasonably deem necessary or desirable in connection with the consummation of such transaction. . . [w]ithout limiting the generality of the foregoing, each Other Holder agrees that he, she or it shall (i) consent to and raise no objections against such transaction; . . . and (iv) refrain from the exercise of appraisal rights with respect to such transaction. . ..[13]

---

[10] *See, e.g., Halpin v. Riverstone Nat'l. Inc.*, 2015 WL 854724, at *8 (Del. Ch. Feb. 26, 2015) ("A contractual waiver of a statutory right, where permitted, is effective only to the extent clearly set forth in the parties' contract.").

[11] *Sunline Com. Carriers, Inc. v. CITGO Petroleum Corp.*, 206 A.3d 836, 847 (Del. 2019) (citing *Kaiser Alum. Corp. v. Matheson*, 681 A.2d 392, 395 (Del. 1996)).

[12] *See, e.g., Juul Labs, Inc. v. Grove*, 238 A.3d 904, 911 (Del. Ch. 2020) (a putative waiver of inspection rights, if ambiguous, "would be ineffective because it would not be expressed clearly and affirmatively, which is the standard for waiver of a statutory right"); *Metromedia*, 971 A.2d at 900 ("in the case of unclear or indirect drafting, [the Court of Chancery] will not cut stockholders off from a statutory right to judicial appraisal of their preferred shares") (quotation omitted); *Kortum v. Webasto Sunroofs Inc.*, 769 A.2d 113, 125 (Del. Ch. 2000) ("There can be no waiver of a statutory right unless that waiver is clearly and affirmatively expressed in the relevant document.").

[13] JA73–74 (Stockholders Agreement § 3(e)).

However, Section 12 of the Agreement sets forth a Termination provision. Pursuant to this provision, all rights and obligations (including Section 3) terminate if and when a Company Sale is consummated. The Termination Provision states:

> This Agreement, and the respective rights and obligations of the Parties, shall terminate upon the earlier of the[:]
>
> (a) consummation of a Company Sale[;] and
>
> (b) execution of a written agreement of each Party (other than the Management Holders who are not also Rollover Stockholders or Reinvesting Stockholders) to terminate this Agreement;
>
> [P]rovided, however, that Section 2, 3, 4, 6, 7, 8 and 9 hereof shall terminate upon the closing of an IPO.[14]

It is not disputed that the merger at issue was a Company Sale. The threshold requirements for invoking the Refrain Obligation were met. In this case, Authentix chose to proceed with a merger by consent in lieu of a stockholder vote. The Board vote and shareholder consent approving and consummating the merger both occurred on September 13, 2017. That consummation triggered Section 12's termination provision. In this scenario, pursuant to 8 *Del. C.* § 262(d)(2), every action Petitioners took to seek and perfect their appraisal rights occurred *after* the closing of the merger. The question is not whether the Stockholders Agreement unequivocally and unambiguously bound Petitioners not to file an appraisal petition. The question is whether that obligation survived termination upon consummation of the Company Sale.

---

[14] JA89 (Stockholders Agreement § 12) (formatting added).

Notably, the parties here chose not to include a savings clause that would have allowed for survival of the Refrain Obligation. Such savings clauses are common. In fact, the NVCA Model Agreement, provided to this Court by the parties in their Joint Appendix, contains such a provision. It states:

> Term. This Agreement shall be effective as of the date hereof and shall continue in effect until and shall terminate upon the earliest to occur of (a) the consummation of the Company's first underwritten public offering of its Common Stock (other than a registration statement relating either to the sale of securities to employees of the Company pursuant to its stock option, stock purchase or similar plan or an SEC Rule 145 transaction); (b) the consummation of a Sale of the Company and distribution of proceeds to or escrow for the benefit of the Stockholders in accordance with the Restated Certificate, *provided that the provisions of Section 3 hereof will continue after the closing of any Sale of the Company to the extent necessary to enforce the provisions of Section 3 with respect to such Sale of the Company; (c) termination of this Agreement in accordance with Section 7.8 below* [; and (d) _____ ___, 20__].[15]

Section 3(e) in the Stockholders Agreement likewise contrasts with the language in the Model Agreement. In the Model Agreement, that section provides that "each Stockholder and the Company hereby agree:. . . to refrain from (i) exercising any dissenters' rights or rights of appraisal under applicable law ***at any time*** with respect to such Sale of the Company. . . ."[16] The Model Agreement specifically calls attention to the *Riverstone* decision and explains how the controlling stockholder's decision in that case to approve the merger by consent terminated the agreement and thereby enabled the

---

[15] JA1322–1323 (NCVA Model Agreement § 6).

[16] JA1315–16 (NCVA Model Agreement § 3.2(e)) (emphasis added).

62

minority shareholders to pursue appraisal rights.[17]  It explicitly advises parties to include express language closing this window.[18]

Nor was the Termination Provision the only place where such a savings clause could have occurred.  Elsewhere in the Stockholders Agreement, the parties inserted language into contractual clauses specifying that certain provisions would survive termination.[19]  They did not include any such language in Section 3(e).

---

[17] JA1316 (NCVA Model Agreement n.16); *see Riverstone*, 2015 WL 854724, at *8–10.

[18] This footnote in the Model Agreement submitted by the parties in the Joint Appendix bears quoting in full:

> An express waiver of appraisal rights is particularly important in light of the Delaware Chancery Court's ruling in *Riverstone National Inc. v. Caplan et.al,* Case No. C.A. 9796-NVCG (Del. Ch. Ct. Feb. 26, 2015).  In *Riverstone*, a corporation's 91% controlling stockholder approved a merger of the corporation by written consent.  When a group of minority stockholders sought statutory appraisal rights, the controlling stockholder purported to exercise drag-along rights contained in a stockholders agreement signed by the minority stockholders that contained an agreement to vote their shares in favor of the merger, but not an express waiver of appraisal rights.  The Court ruled that because the drag-along in question was limited to a voting agreement (which if enforced would have resulted in a waiver of appraisal rights), the drag along was only operative and enforceable prior to the merger's becoming effective. *Once the merger was effective, the voting agreement had terminated, the minority stockholders who had not voted in favor of the merger were no longer obligated to vote and thus could exercise their appraisal rights.*  Importantly, the Court did not decide whether common stockholders can waive statutory appraisal rights in advance through a contractual drag-along provision so *the efficacy of this provision is not certain*.  Including it, however, provides *an argument* that appraisal rights have been extinguished even if the drag-along and related voting agreement are not implemented in connection with a merger.

JA1316 1316 (NCVA Model Agreement n.16) (emphasis added).

[19]  JA88 (Stockholders Agreement § 10(h)) (dealing with contribution and indemnification provisions, "The obligations of the Company and the Registering Stockholders under this Section 10 shall survive the completion of any offering of Registrable Common Stock in a registration statement, including the termination of this Agreement.") (underline in original).

The Court of Chancery made much of the fact that the parties to the Stockholders Agreement were sophisticated.[20] The parties were obviously familiar with such savings clauses. Authentix, simply put, did not negotiate for an express term specifying that the Refrain Obligation survived termination despite the parties demonstrating a clear understanding of how to craft such a provision.[21]

Nor does the language of Section 3(e) render such a continuing obligation implicit. Words should be given their "plain, ordinary meaning."[22] *Refrain* is not a technical word of the legal profession.[23] As a question of ordinary language, to *refrain* from an act tends to imply a forbearance that is temporary or conditional rather than permanent.[24] Indeed, the Court of Chancery noted an example of *refrain* used lyrically in precisely this

---

[20] *Manti Holdings, LLC v. Authentix Acq. Co. (Manti III)*, 2020 WL 4596838, at *2 (Del. Ch. Aug. 11, 2020) ("there is no record evidence that the Petitioners were not fully informed; to the contrary, there is evidence that the Petitioners are sophisticated investors who were fully informed and represented by counsel when they signed the [Stockholders Agreement], under which they obtained some rights and relinquished others.").

[21] *Metromedia*, 971 A.2d at 900 ("[I]n the case of unclear or indirect drafting, this Court will not cut stockholders off from a statutory right to judicial appraisal of their preferred shares.").

[22] *Alta Berkeley VI C.V. v. Omneon Inc.*, 41 A.3d 381, 385 (Del. 2012).

[23] There is no entry for "refrain" in BLACK'S LAW DICTIONARY (11th ed. 2019); nor BALLENTINE'S LAW DICTIONARY (3d ed. 1969); nor BOUVIER LAW DICTIONARY DESK EDITION (2012).

[24] *See Refrain*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, 1909 (2002) (distinguishing refrain from its synonyms by explaining "REFRAIN is more suitable than ABSTAIN or FORBEAR to indicate checking or inhibiting an inclination or impulse, especially a momentary or passing one"); *see also* "*Refrain*," MERRIAM-WEBSTER ONLINE DICTIONARY, ("to keep oneself from doing, feeling, or indulging in something and *especially from following a passing impulse*") (emphasis added), https://www.merriam-webster.com/dictionary/refrain.

transitory sense in popular music.[25] "Refrain" in that sense implies continuation of the right and its later availability when the requirement to refrain has passed.

"Waive," by contrast, is a word implying greater permanence.[26] This distinction is especially true in the legal profession, where practitioners well-recognize the longstanding technical definition of waiver, "an intentional relinquishment or abandonment of a known right or privilege."[27] That definition is so well-established[28] as to be recognized in lay dictionaries.[29] Nor must the Court rely on inference to know that the sophisticated parties

---

[25] *See Manti I*, 2018 WL 4698255, at *3 n.16 (citing Arlo Guthrie, *City of New Orleans* (Reprise Records 1972) and remarking that "[t]he Petitioners make a valiant attempt to freight the term 'refrain' with more ambiguity than anyone since Arlo Guthrie."). Steve Goodman wrote the song, later popularized by Guthrie, about and while aboard the eponymous Chicago-to-New Orleans passenger rail route. *See generally*, Craig Sanders, *Writing of City of New Orleans*, TRAINS, Sept. 2017, at 34–39 (describing the history of the song and its many covers by other musicians), https://www.trains.com/trn/magazine/archive-access/trains-september-2017/. The relevant lyric, "the passengers will please refrain" references signage on passenger rail lavatories which commonly instructed passengers to "refrain from flushing toilets *while the train is standing in the station*." Jack Smith, *Train Sign Fits an Old Song in a Fine Meter*, LOS ANGELES TIMES, Sept. 10, 1987 (emphasis added), https://www.latimes.com/archives/la-xpm-1987-09-10-vw-6928-story.html. Far from being an ambiguous lyric, *refrain* in this context only makes sense as a transitory obligation that lapses once the circumstance giving rise to the obligation ceases to apply. In other words, once the merger closed, the train had left the station so to speak, and the obligation to refrain no longer applied.

[26] *See Waiver*, 2 BOUVIER LAW DICTIONARY DESK EDITION, 2970 (2012) ("Waiver is an act by which a person or entity holding a right, privilege, claim, or any other interest in law or equity that may be asserted or defended in any forum elects not to assert it or defend it, *electing not to do so in some manner that makes the election final*.") (emphasis added).

[27] *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938).

[28] *E.g., College Sav. Bank v. Fl. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 682 (1999) (quoting *Johnson*, 304 U.S. at 464); *Minnick v. Mississippi*, 498 U.S. 146, 159 (1990) (same); *Pellaton v. Bank of New York*, 592 A.2d 473, 46 (Del. 1991) (same); *Lewis v. State*, 757 A.2d 709, 714 (Del. 2000) (same).

[29] *See Waiver*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, at 2570 ("the act of waiving or intentionally relinquishing or abandoning a known right, claim, or privilege"). Other dictionaries do the same, *e.g., Waive*, MERRIAM-WEBSTER ONLINE

in this case parsed the distinction between "waive" versus other words of forbearance since they used "waive" elsewhere in the Stockholders Agreement.[30]  The meaning of *waive* has some overlap with *refrain*,[31] but where sophisticated parties use both terms in a single document we should assume that the usage of distinct terms was intended by the parties and we should give that distinct usage meaning.[32]  Understanding the Refrain Obligation to use *refrain* as a narrower restriction than *waive* is consistent with both Section 3(e) and the Termination Provision, gives effect to both provisions, and defers to the parties' own choice of contractual language.

---

DICTIONARY ("to relinquish (something, such as a legal right) voluntarily"), https://www.merriam-webster.com/dictionary/waive.

[30] For example, Section 13(d) provides that "[e]ach Party *waives* any right to a trial by jury in any such suit or proceedings."  A90 (emphasis added); *see also id*. at A81 § 10(a) ("the Carlyle Majority may waive, on behalf of all holders of Registrable Common Stock, any right to participate in or receive notice of any registration of Common Stock. . .") and A88 § 10 (i) ("Waiver of Registration Rights").

[31] *See Waive*, Black's Law Dictionary (11th ed. 2019) (giving a second definition, "To refrain from insisting on (a strict rule, formality, etc.); to forgo."); *Waive*, New Oxford American Dictionary, 1943 (3d ed. 2010) ("refrain from insisting on or using (a right or claim): *he will waive all rights to the money*.").  We have likewise held that waiver "implies knowledge of all material facts and an intent to waive, together with a willingness to refrain from enforcing those rights." *Bantum*, 21 A.3d at 50 (emphasis added).  That is, waiver *includes* the obligation to refrain *but goes further*, requiring a showing that the party specifically intended to pledge permanent rather than temporary forbearance.  The *Bantum* Court likewise cited the traditional definition of waiver, "the voluntary and intentional relinquishment of a known right."  The word "relinquishment" carries with it this same connotation of definitiveness or permanence.  *See Relinquishment*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE, at 1919 ("the act of relinquishing : a giving up : surrender, renunciation."); *see also id.* at 1918 (listing the synonyms for "relinquish" as "LEAVE, ABANDON, WAIVE, RESIGN, CEDE, YIELD, SURRENDER.").

[32] *Davis Broad. of Atlanta LLC v. Charlotte Broad., LLC*, 134 A.3d 759, 2016 WL 837367, at *1 (Del. 2016) (TABLE) (when a contract used "date of filing" instead of the defined term "Filing Date" used elsewhere in the contract, "[a]lthough not dispositive, that intentional choice must incline the interpretative process toward giving the distinct usage meaning.").

Finally, Authentix argues that applying the Termination Provision as written renders the Refrain Obligation "a nullity" or at least "commercially unreasonable."[33] I disagree. When a merger is subject to a vote at a meeting of stockholders, those owners who wish to seek appraisal in lieu of merger consideration must take steps to perfect their appraisal rights before the meeting and vote.[34] Proceeding in that fashion would have forced Stockholders either to breach their obligations *prior to termination* or forfeit the opportunity to perfect their appraisal rights. Carlyle freely chose to proceed differently.[35]

In sum, for the Stockholders Agreement to cut off Petitioners' statutory appraisal rights Authentix needs to show at the very least it provides for such a derogation in unambiguous terms and in language that is unquestionably and unequivocally clear. *This* Stockholders Agreement, which unambiguously terminated before any of the complained-of conduct, and with a savings clause for other sections but pointedly *not* for the Refrain Obligation, does not do so.[36] Given that there is a reasonable reading of these provisions

---

[33] Ans. Br. at 25–26.

[34] *E.g.,* 8 *Del. C.* § 262(d)(1) ("If a proposed merger or consolidation for which appraisal rights are provided under this section is to be submitted for approval at a meeting of stockholders. . . [e]ach stockholder electing to demand the appraisal of such stockholder's shares shall deliver to the corporation, before the taking of the vote on the merger or consolidation, a written demand for appraisal of such stockholder's shares. . .").

[35] *See e.g., Riverstone*, 2015 WL 854724, at * 10 ("Both Riverstone and the Minority Stockholders are sophisticated parties, and both are charged with knowledge as to the various ways Riverstone could have carried out a merger under Delaware law, including by written consent pursuant to Section 228. Yet, with full awareness that it could consummate a merger by written consent, without the Minority Stockholders' knowledge or involvement, Riverstone agreed to a drag-along rights that by their unambiguous terms did not apply to this retrospective scenario.").

[36] *See O'Brien v. Progressive N. Ins. Co.*, 785 A.2d 281, 288 (Del. 2001) (defining an ambiguous contract as one where "the provisions in controversy are reasonably or fairly susceptible to

in Petitioners' favor, I would find the Stockholders Agreement's unclear drafting renders it at least ambiguous, and so not sufficiently clear to divest Petitioners of their statutory right to appraisal. Reversal is justified on that ground alone.

But there are two more bases for reversal.

## II. *Appraisal Rights Are Fundamental Features of Corporate Governance, and Modifications Should Be Permitted Only in the Corporate Charter.*

The second reason to reverse the Court of Chancery is that even if the "waiver" were sufficiently clear and unambiguous, permitting waiver of fundamental corporate governance rights in a *stockholders agreement* as opposed to in the corporation's constitutive documents,[37] is problematic. Here the issue is: to what extent can a waiver of statutory rights be effectuated via a *stockholders agreement*, and what are the limiting principles on such private ordering for Delaware corporations?

As this Court recognized in *Salzberg v. Sciabacucchi*,[38] the DGCL allows for substantial private ordering. We said:

> [T]he DGCL allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise. "At its core, the [DGCL] is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters and judicially imposed principles of fiduciary duty are honored." In fact, "Delaware's corporate statute is widely regarded as the most flexible in the nation because it leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to

---

different interpretations or may have two or more different meanings.") (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992)).

[37] That is, the bylaws or, preferably, the charter.

[38] 227 A.3d 102 (Del. 2020).

68

relatively loose statutory constraints and to the policing of director misconduct through equitable review."[39]

In *Salzberg*, we considered the validity of a provision in a Delaware *certificate of incorporation* requiring actions arising under the federal Securities Act of 1933 to be filed in a federal court. We held that such a charter provision was facially valid and within the parameters of Section 102(b)(1). But we also observed that Section 102(b)'s broad authorization was constrained by the phrase, "if such provisions are not contrary to the *laws of this State*."[40] We held that federal forum provisions "do not violate the policies or laws of this State."[41]

We further observed that although "Section 102(b)(1)'s scope was broadly enabling," additional limits are imposed by *public policy*:

> First, Section 102(b)(1)'s scope is broadly enabling. For example, in *Sterling v. Mayflower Hotel Corp.*, this Court held that Section 102(b)(1) bars only charter provisions that would "achieve a result forbidden by settled rules of public policy." Accordingly, "the stockholders of a Delaware corporation may by contract embody in the certificate of incorporation a provision departing from the rules of common law, provided that it does not transgress a statutory enactment *or a public policy settled by the common law or implicit in the General Corporation Law itself*."[42]

*Salzberg* addressed private ordering through a charter provision. By contrast, the phenomenon we address here has largely evolved in the private company realm by start-up companies and venture capital firms who have developed a practice of using

---

[39] *Id*. at 116 (citations omitted).

[40] *Id*. at 115 (citing 8 *Del. C*. § 102(b)(1)).

[41] *Id*.

[42] *Id*. at 115–16 (emphasis added) (alteration omitted).

*stockholder agreements* to structure significant aspects of their corporation's corporate governance. This practice apparently has become fairly commonplace in that sector. In fact, commentators have observed that private equity transactions for years have been including drag-along rights that include waivers of statutory rights such as appraisal.[43] The Majority is, no doubt, concerned about upsetting what has, or is becoming, an established practice in that sector.

I appreciate that "our DGCL was intended to provide directors and stockholders with flexibility and wide discretion for private ordering and adaption to new situations."[44] The use of stockholder agreements to (purportedly) effectuate waivers of Section 262 rights is evidence that such waivers, at least in that sector of the capital markets, may be achieving efficiencies beneficial to the parties. But the question that this Court must answer is whether that is a practice that is consistent with the DGCL and relevant public policy.

Why should the use of stockholder agreements, as opposed to the corporation's constitutive documents, as the vehicle for effectuating such waivers matter? After all, this Court recently has reiterated its view that private ordering through binding contracts ought to be respected. For example, in *ev3, Inc. v. Lesh*, we stated that "[w]hen parties have

---

[43] *See, e.g., Drag-along Rights and Appraisal Remedies in Stockholders Agreements*, PRACTICAL LAW CORPORATE & SECURITIES (Mar. 26, 2015) ("The ability to contractually waive the appraisal remedy has not typically been thought of as controversial. . ..”), https://1.next.westlaw.com/4-523-5341.

[44] *Salzberg*, 227 A.3d at 137 n.169 ("[Delaware corporations have] the broadest grant of power in the English-speaking world to establish the most appropriate internal organization and structure for the enterprise.") (alteration in original) (quoting *Jones Apparel Grp. v. Maxwell Shoe Co., Inc.*, 883 A.2d 837, 845 (Del. Ch. 2004)).

ordered their affairs voluntarily through a binding contract, Delaware law is strongly inclined to respect their agreement and will only interfere upon a strong showing that dishonoring the contract is required to vindicate a public policy interest even stronger than freedom of contract."[45] And in *Salzberg*, we agreed that freedom of contract is a public policy of paramount importance in Delaware.[46] But again, as in *ev3, Inc.* and *Salzberg*, we have acknowledged public policy and statutory limitations.

I believe the use of stockholder agreements to effect *ex ante* waivers of governance rights of common stockholders is problematic. The Petitioners challenge the use of stockholder agreements for effectuating such waivers and argue that the Stockholders Agreement "operates as a *de facto* charter that supersedes Delaware's hierarchical

---

[45] 114 A.3d 527, 529 n.3 (2014) (quoting *Libeau v. Fox*, 880 A.2d 1049, 1056–57 (Del. Ch. 2005), *aff'd in relevant part* 892 A.2d 1068 (Del. 2006)). In *ev3*, former shareholders of an acquired corporation sued for breach of an earn-out milestone provision, arguing that the buyer violated its obligation to adequately fund pursuit of the milestones. *Id.* at 529. The contract provided that funding would be in the buyer's sole discretion, exercised in good faith. *Id.* Although the contract also partially incorporated a letter of intent from the negotiation phase which specified that the buyer should provide funding to pursue the milestones, the final contract included an express clause by which the final agreement overrode contrary provisions as to funding. *Id.* at 529–30. Where two contractual clauses appear to be in conflict, another clause specifying which takes priority provides a simple mechanism for resolving the tension without resort to questions of public policy. That circumstance contrasts with cases where a contractual clause conflicts with a *statutory* right, as with the *Libeau* case which *ev3* cited and which addressed whether a contract had waived the statutory right to partition of real property. *Libeau*, 880 A.2d at 1058 (requiring waiver "'by clear affirmative words or actions'" for a contract to eliminate a right conferred by statute) (citing *Ford Holdings*, 698 A.2d at 979).

[46] *See, e.g., Salzberg*, 227 A.3d at 116 ("Delaware's corporate statute . . . leaves the parties to the corporate contract (managers and stockholders) with great leeway to structure their relations, subject to relatively loose statutory constraints. . ..."); *NAF Hldgs., LLC v. Li & Fung (Trading) Ltd.*, 118 A.3d 175, 180 n.14 (Del. 2015) ("Delaware upholds the freedom of contract and enforces as a matter of fundamental public policy the voluntary agreements of sophisticated parties.") (quoting *NACCO Indus. v. Applica Inc.*, 997 A.2d 1, 35 (Del. Ch. 2009)).

corporate contract."[47]    It is undisputed that the Stockholders Agreement bound all outstanding shares of Authentix stock.[48]    Further, Section 13(b) provides that it "shall be binding upon . . . assigns and any other transferee and shall also apply to any securities acquired by a Holder after the date hereof."[49]    Section 2 likewise purports to require that all future transferees must execute and join the Stockholders Agreement.[50]    Because of this, Petitioners argue that this arrangement is akin to a *de facto* charter.[51]    It is also undisputed that none of the Stockholders Agreement's restrictions and obligations at issue is in the Company's charter.    They further argue that the decision to permit this use of a stockholders agreement violates this hierarchy.    Specifically, they contend that a stockholder agreement (to which the corporation is a party) sits at the bottom of the

---

[47] Op. Br. at 4.  They expound further on this point:

> *[I]f* such an agreement is enforceable stockholder-to-stockholder, permitting creation and enforcement by the corporation itself against its own stockholders would mean that no principled barrier would prevent a Delaware corporation from using a separate agreement to create *for itself* second-class stockholders with rights not set forth in the charter (because it would be illegal to put them in the charter).

*Id*. at 5 (alteration added) (emphasis in original).

[48] It was binding upon all the Company's then-stockholders at the time of its execution in 2008.

[49] JA89 (Stockholders Agreement § 13(b)).

[50] JA72 (Stockholders Agreement § 2).

[51] Op. Br. at 4 ("If affirmed, [the Court of Chancery's decision] would mean that a prospective investor/controller could be offered by a *corporation* as an incentive -- or could demand (like here) that a *corporation* obtain -- an agreement from all of the corporation's stockholders (enforceable by the corporation) that waives *ex ante* mandatory provisions of the DGCL and operates as a *de facto* charter that supersedes Delaware's hierarchical corporate contract.") (alteration added) (emphasis in original).

hierarchy. To the extent stockholder agreements are being utilized to effectuate what would be restricted in charters and bylaws, this point has merit.[52]

This Court has long observed that the certificate of incorporation, together with bylaws and the DGCL form part of a flexible contract between a corporation and its stockholders. "The components of [the corporate] contract form a hierarchy, comprising from top to bottom (i) the [DGCL], (ii) the certificate of incorporation, and (iii) the bylaws."[53] "Each of the lower components of the contractual hierarchy must conform to the higher components."[54] And "[a] bylaw that conflicts with the charter is void, as is a bylaw or charter provision that conflicts with the DGCL."[55]

Petitioners argue that ancillary agreements to which the corporation is a party are not exempt from having to conform to this hierarchy. Support exists for that proposition. For example, the Court of Chancery has observed that:

> When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-

---

[52] *See, e.g.*, *Ford Holdings*, 698 A.2d at 976 ("Generally, these mandatory provisions may not be varied by terms of the certificate of incorporation *or otherwise*.") (emphasis added).

[53] *Sinchareonkul v. Fahnemann*, 2015 WL 292314, at *6 (Del. Ch. Jan. 22, 2015).

[54] *Id*. Thus, for example, a corporate charter can confer onto the board of directors the power to alter the bylaws beneath it (8 *Del. C.* § 109(a)), but the bylaws cannot derogate the corporate charter that sits above it (8 *Del. C.* § 109(b)). *See, e.g.*, *Centaur Partners IV v. Nat'l Intergroup, Inc.*, 582 A.2d 923, 929 (Del. 1990) ("Where a by-law provision is in conflict with a provision of the charter, the by-law provision is a 'nullity.'") (quoting *Burr v. Burr Corp.*, 291 A.2d 409, 410 (Del. Ch. 1972)); 8 *Del. C.* § 109(b) ("The bylaws may contain any provision, *not inconsistent with law or with the certificate of incorporation*, relating to the business of the corporation, the conduct of its affairs, and its rights or powers or the rights or powers of its stockholders, directors, officers or employees.") (emphasis added). Likewise, the DGCL and all of its amendments "shall be a part of the charter or certificate of every corporation," and thus the General Assembly through its power to amend the DGCL sits at the top of the hierarchy. 8 *Del. C.* § 394.

[55] *Sinchareonkul*, 2015 WL 292314, at *6.

73

specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and (iv) other entity-specific contractual agreements, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement.[56]

In addition to case law support, I note that the General Assembly has expressly indicated when certain actions not permitted to be taken in charters may be effectuated in stockholders agreements. For example, Section 115 of the DGCL deals with forum selection clauses for internal corporate claims, and specifies that "no provision of the certificate of incorporation or the bylaws may prohibit bringing such claims in the courts of this State."[57] The synopsis of the bill enacting Section 115 expressly provides that "Section 115 is not intended . . . to prevent any such provision in a stockholders agreement . . . signed by the stockholder against whom the provision is to be enacted."[58]

There are some valid policy concerns with using stockholder agreements to effect *ex ante* waivers of appraisal rights for common stockholders. For example, some commentators have pointed out the dangers of "stealth governance" and have argued that "using shareholder agreements for corporate governance . . . sacrifices critical corporate

---

[56] *Quadrant Structured Prod. Co. v. Vertin*, 2014 WL 5465535, at *3 (Del. Ch. Oct. 28, 2014); *see also Marmon v. Arbinet-Thexchange, Inc.*, 2004 WL 936512, at *5 (Del. Ch. Apr. 29, 2004) (holding that the company's directors "were not free to contract away disclosure obligations that they had a fiduciary duty to observe," and that "[n]or could they rely upon a certificate provision prohibiting disclosure to avoid a shareholder's inspection right conferred by statute," and by doing so, the "directors and management made the corporation complicit in their violations of fiduciary, as well as statutory, law.").

[57] 8 *Del. C.* § 115.

[58] Del. S.B. 75 syn.

law values."[59]   The scope of these stockholder agreements now includes (putative) restrictions or waivers of inspection rights, appraisal rights and fiduciary duties of directors.[60]

No doubt, the sophisticated parties entering into these agreements have found them to be beneficial.  Stockholder agreements may offer venture capital funded start-ups flexibility versus complying with the formalities of charters and bylaws.  And unlike charters, they are not public documents filed with the Secretary of State.  But restriction

---

[59] *See generally*, Fisch, Jill E., *Stealth Governance:  Shareholder Agreements and Private Ordering*, FACULTY SCHOLARSHIP AT PENN LAW (2021) (arguing that "stealth governance is inappropriate for corporations and instead advocates a uniform structural approach to corporate law that would limit private ordering to the charter and bylaws."), https://scholarship.law.upenn.edu/faculty_scholarship/2199.  As Professor Fisch notes, shareholder agreements purporting to derogate critical rights afforded to shareholders under the DGCL are apparently common among startup companies that have not gone public. *Id*. at 5.  Precisely because they are not part of the incorporating documents filed with the Secretary of State, the public can become aware of them only when they are litigated.

[60] *See* Fisch at 5 n.15 ("Both appraisal waivers and inspection rights waivers are part of the most recent versions of the National Venture Capital Association's model documents.") (citing NVCA, *Voting Agreement*, at 7 (July 2020), https://nvca.org/recommends/nvca-2020-voting-agreement-2/; NVCA, *Investors' Rights Agreement*, at 24–25 (September 2020), https://nvca.org/recommends/nvca-2020-investors-rights-agreement-2/).  As Professor Fisch notes, the NVCA model documents also purport to waive the right to assert post-merger claims for breaches of fiduciary duties. *Id*.  Further in this regard, I note that a footnote to Section 3(e) of the Model Agreement submitted by the parties states that:

> Even if appraisal rights are waived, common and subordinate preferred stockholders are increasingly filing breach of fiduciary duty claims seeking quasi-appraisal – i.e., damages that mirror the recovery available in an appraisal suit – in transactions subject to drag along provisions where the junior preferred or common shareholders are to receive no consideration for their shares.  Because the directors are often representatives of the senior preferred holders, these suits are difficult to dismiss at an early stage. *Accordingly consideration should be given to expanding the agreement to include an agreement not to file appraisal actions to cover breach of fiduciary suits in transactions subject to the drag along.*

JA1316–17 (NCVA Model Agreement § 3.2(e) n.17) (emphasis added).

or elimination of important stockholder rights such as inspection, appraisal, election rights and fiduciary duties may minimize accountability of the Board and upset the delicate balance of power that the General Assembly and courts have attempted to maintain among a Delaware corporation's constituencies.[61]

The ordinary place for private ordering provisions that alter this balance is in the charter or bylaws.[62] Principles of corporate democracy support this preference.[63] If a

---

[61] For example, while the DGCL authorizes mergers approved by a majority vote of the outstanding shares, 8 *Del. C.* § 251(c), it permits a corporation to impose a supermajority provision if it does so *in the certificate of incorporation. See Berlin v. Emerald Partners*, 552 A.2d 482, 488–89 n.8 (Del. 1988) ("The approval of a merger, under the Delaware General Corporation Law, requires the affirmative vote of a majority of the outstanding common stock of the corporations unless the certificate of incorporation provides for a higher percentage.").

[62] *In Centaur Partners IV v. Nat'l Intergroup, Inc.*, this Court stated:

> In *Standard Power*, this Court held that the rules of corporate democracy are based in large part upon the principle that a majority of the votes cast at a stockholders meeting is sufficient to elect directors. Although by statute a simple plurality provision now suffices, the result is the same: a charter or bylaw provision which purports to alter this principle must be positive, explicit, clear and readily understandable. This presumption is overcome only by a clear, unambiguous and unequivocal statement, *in the charter or by-laws of a corporation*, expressing the stockholders' desire that a specific percentage of votes be required.

582 A.2d at 927 (emphasis added) (citations and alterations omitted) (citing *Std. Power & Light Corp. v. Invest. Assocs., Inc.*, 51 A.2d 572, 576 (Del. 1947)).

[63] *See* 8 *Del. C.* § 141(d) (addressing classified boards). This section allows for a departure from the default rule of annual elections of the *full* board in favor of election instead of at most three classes of director "by the certificate of incorporation or by an initial bylaw, or by a bylaw adopted by a vote of the stockholders." *Id.*; *see also Boilermakers Local 154 Ret. Fund v. Chevron Corp.*, 73 A.3d 934, 939 (Del. Ch. 2013) (observing that "the certificate of incorporation may authorize the board to amend the bylaws' terms and that stockholders who invest in such corporations assent to be bound by board-adopted bylaws when they buy stock in those corporations"); *id.* at 958 ("Where, as here, the certificate of incorporation has conferred on the board the power to adopt bylaws, and the board has adopted a bylaw consistent with 8 *Del. C.* § 109(b), the stockholders have assented to that new bylaw being contractually binding."). In *Williams v. Geier*, this Court observed for example, that:

> At its core, the Delaware General Corporation Law is a broad enabling act which leaves latitude for substantial private ordering, provided the statutory parameters

private contract by and between all stockholders could override the charter and bylaws, that agreement would transform the corporate governance documents into gap-filling defaults and collapse the distinction between a corporation and alternative entities. Thus, assuming *arguendo* the validity of *ex ante* waivers of important statutory governance rights like appraisal rights (the question next addressed), they should be in a corporation's charter and not in a stockholders agreement.[64]

---

and judicially imposed principles of fiduciary duty are honored. Although directors are given much discretion in managing the business and affairs of the corporation, some fundamental measures require stockholder action. For example, when the statutory framework was altered in 1986 to permit some exemptions from personal liability for directors in 8 *Del. C.* § 102 (b)(7), it was (and is) the legislative policy of this State that such exemptions could be enjoyed by directors only if the stockholders approved such a provision in the certificate of incorporation. Further, all amendments to certifications of incorporation and mergers require stockholder action. Thus, Delaware's legislative policy is to look to the will of the stockholders in these areas.

671 A.2d 1368, 1381 (Del. 1996). As we further explained, the process of amending certificates of incorporation enjoys a favored place within that statutory framework because of its procedural safeguards:

Like the statutory scheme relating to mergers under 8 *Del. C.* § 251, it is significant that two discrete corporate events must occur, in precise sequence, to amend the certificate of incorporation under 8 *Del. C.* § 242: First, the board of directors must adopt a resolution declaring the advisability of the amendment and calling for a stockholder vote. Second, a majority of the outstanding stock entitled to vote must vote in favor. The stockholders may not act without prior board action. Likewise, the board may not act unilaterally without stockholder approval. Therefore, the stockholders control their own destiny through informed voting. *This is the highest and best form of corporate democracy.*

*Id*. (emphasis added).

[64] I note that the Maryland Legislature has authorized such waivers but only in a corporation's *charter*. *See, e.g.,* MD CODE, CORP & ASS'NS, § 3-202(c)(4) ("Unless the transaction is governed by § 3-602 of this title or is exempted by § 3-603(b) of this title, a stockholder may not demand the fair value of the stockholder's stock and is bound by the terms of the transaction if. . . [t]he *charter* provides that the holders of the stock are not entitled to exercise the rights of an objecting stockholder under this subtitle; . . .") (emphasis added). Similarly, the Model Business Corporation Act authorizes waiver of appraisal rights but only for preferred stock and only in

III.   *Based Upon Statutory Language, the Structure of the Various Entity Statutory Schemes, and Public Policy, the Better View is That Appraisal Rights Are Mandatory.*

My third concern, which would also be a basis for reversal, is that I do not believe that such an *ex ante* waiver of appraisal rights for common stockholders is presently permissible.  I start with the proposition that there are at least *some* provisions of the DGCL that are mandatory.  This proposition is not all that controversial.[65]  A consensus has emerged that at least some provisions of the DGCL are mandatory and simply cannot be waived.[66]  In *Ford Holdings*, Chancellor Allen listed a number of mandatory provisions:

> Thus, unlike the corporation law of the nineteenth century, modern corporation law contains few mandatory terms; it is largely enabling in character.  It is not, however, bereft of mandatory terms.   Under Delaware law, for example, a corporation is required to have an annual meeting for the election of directors; is required to have shareholder approval for

charter provisions.  MBCA § 13.02(c) (Dec. 2020), https://www.americanbar.org/content/dam/aba/administrative/business_law/corplaws/2020_mbca.pdf.  The Official Comment explains:

> Section 13.02(c) permits the corporation to eliminate or limit appraisal rights that would otherwise be available for the holders of one or more series or classes of preferred shares provided that the standards in that section are met.  Chapter 13 does not permit the corporation to eliminate or limit the appraisal rights of common shares.

MBCA § 13.02, cmt. 3.

[65] I recognize that there has been an ongoing debate as to whether any mandatory provisions are desirable.  *See, e.g., Ford Holdings*, 698 A.2d at 976–77 ("This question is a specification of the general question -- which has received a great deal of scholarly attention -- whether, as a matter of sound policy, mandatory provisions are ever desirable in corporation law.").

[66] *See, e.g.,* Edward P. Welch & Robert S. Saunders, *Freedom and its Limits in the Delaware General Corporation Law*, 33 DEL. J. CORP. L. 845 (2008) (arguing that there are a few statutory provisions that cannot be limited in a certificate of incorporation and identifying, among them, rights of stockholders to periodically elect directors, to inspect books and records, and directors' duty of loyalty); *see also Rainbow Nav., Inc. v. Pan Ocean Nav., Inc.*, 535 A.2d 1357, 1359 (Del. 1987) (holding that Section 220 creates mandatory inspection rights that "can only be taken away by statutory enactment.").

amendments to the certificate of incorporation; must have appropriate shareholder concurrence in the authorization of a merger; and is required to have shareholder approval in order to dissolve. Generally, these mandatory provisions may not be varied by the terms of the certificate of incorporation or otherwise. *Among these mandatory provisions of Delaware law is Section 262, the appraisal remedy.*[67]

But moving from that starting point, there is considerable debate as to *which* provisions are mandatory. Resolving that debate is a difficult task.

I submit that the analysis must begin with the text of the statute -- in this case, Section 262.[68] "The 'most important consideration for a court in interpreting a statute is the words the General Assembly used in writing it.'"[69] "The court must 'give the statutory words their commonly understood meanings.'"[70] The General Assembly's use of the word "shall" in Section 262(a) is significant.[71] It suggests that the statutory remedy of appraisal is mandatory if a stockholder petitions for it.[72] Also, Section 262(a), unlike dozens of

---

[67] 698 A.2d at 976 (emphasis added) (footnotes omitted).

[68] *Salzberg*, 227 A.3d at 113.

[69] *Id.* (quoting *Boilermakers*, 73 A.3d at 950).

[70] *Id.* (quoting *Kofron v. Amoco Chems. Corp.*, 441 A.2d 226, 230 (Del. 1982)).

[71] *See* 8 *Del. C.* § 262(a):

> Any stockholder of a corporation of this State who holds shares of stock on the date of the making of a demand pursuant to subsection (d) of this section with respect to such shares, who continuously holds such shares through the effective date of the merger or consolidation, who has otherwise complied with subsection (d) of this section and who has neither voted in favor of the merger or consolidation nor consented thereto in writing pursuant to § 228 of this title *shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock under the circumstances described in subsections (b) and (c) of this section.*

[72] *See, e.g., Arnold v. State*, 49 A.3d 1180, 1183 (Del. 2012) ("The mandatory 'shall' normally creates an obligation impervious to judicial discretion.") (alterations omitted) (quoting *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 35 (1998)); *H-M Wexford LLC v.*

other provisions of the DGCL, does not use the phrase "unless otherwise provided in the certification of incorporation."

But the text of the statute and the use of the word "shall" may not be determinative. Further, Petitioners accept that in the DGCL, the lack of a prefatory clause such as "unless otherwise provided in the certificate of incorporation" is not always determinative of what is modifiable.[73] Indeed, our courts have found certain statutory provisions to be modifiable even absent these words. For example, in *Jones Apparel Group, Inc. v. Maxwell Shoe Co.*, the Court of Chancery held that for Section 102(b)(1)[74] to have

---

*Encorp, Inc.*, 832 A.2d 129, 152 (Del. Ch. 2003) (the requirements of Section 228(c) are mandatory because "the word 'shall' is a mandatory term.").

[73] Reply Br. at 22. For example, the General Assembly has made some DGCL provisions explicitly default. *E.g.,* 8 *Del. C.* § 212(a) ("Unless otherwise provided in the certificate of incorporation and subject to § 213 of [the DGCL], each stockholder shall be entitled to 1 vote for each share of capital stock held by such stockholder.") (alteration added); 8 *Del. C.* § 223(a) (providing rules for filling vacancies on the board of directors which apply "[u]nless otherwise provided in the certificate of incorporation or bylaws"); 8 *Del. C.* § 273(a) (allowing either stockholder of a corporation owned by exactly two owners in equal shares to petition for dissolution "unless otherwise provided in the certificate of incorporation of the corporation or in a written agreement between the stockholders"). One might argue that inclusion of such clauses implies that some provisions of the DGCL not so designated cannot be so derogated, because "[w]here the General Assembly prescribes a form of conduct, the manner of its performance and operation, and the *persons and things to which it refers are affirmatively or negatively designated, there is an inference that all omissions were intended by the legislature.*" *Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) (quoting and adding emphasis to Norman J. Singer, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION, § 4915 (3d Ed.)). But *Jones Apparel*, discussed next, provides an effective rebuttal that these "magic words" are not dispositive.

[74] Section 102(b)(1) provides:

> In addition to the matters required to be set forth in the certificate of incorporation by subsection (a) of this section, the certificate of incorporation may also contain any or all of the following matters:. . . [a]ny provision for the management of the business and for the conduct of the affairs of the corporation, and any provision creating, defining, limiting and regulating the powers of the corporation, the directors, and the stockholders, or any class of the stockholders, or the governing

meaning, it must not be limited to modifying default provisions of the DGCL that contain "magic words" permitting contrary provisions.[75] Otherwise, "there is no independent utility to [section] 102(b)(1)."[76] Rather, a court must determine, based upon a careful and specific review, whether a particular certificate provision contravenes Delaware public policy in the form of statutory or common law.[77]

Adding to the difficulty here is that our courts have not yet established a clear analytical framework to discern where the dividing line is. I offer the view that certain key statutory provisions that establish the balance of powers and checks and balances between and among stockholders, directors, and officers, may qualify as mandatory, particularly when the General Assembly uses mandatory language in the provisions.[78]

---

body, members, or any class or group of members of a nonstock corporation; if such provisions are not contrary to the laws of this State.

8 *Del. C.* s 102(b)(1).

[75] 883 A.2d at 847–48; *see id.* at 845 ("Currently, our corporate code contains 48 separate provisions expressly referring to the variation of a statutory rule by charter. Those provisions generally lay out various statutory rules, but include prefatory language such as 'unless otherwise provided in the certificate of incorporation.'") (footnote omitted).

[76] *Id.* at 848.

[77] *Id.* As then-Vice Chancellor Strine noted, while Section 102(b)(1) and Section 141(a) are "important expressions of the wide room for private ordering authorized by the DGCL," that wide room is provided "*when such private ordering is reflected in the corporate charter.*" *Id.* at 839 (emphasis added).

[78] *See* Leo E. Strine Jr., & J. Travis Laster, *The Siren Song of Unlimited Contractual Freedom*, HARVARD L. SCHOOL JOHN M. OLIN CENTER DISCUSSION PAPER NO. 789, at 6 (Aug. 1, 2014) (noting that "[a]fter all, American corporate law statutes have few mandatory requirements" and that "the notion that American corporate statutes contain burdensome and non-waivable provisions that hamper managerial effectiveness is not an intuitively obvious one."), https://ssrn.com/abstract=2481039; *id.* ("[t]o the contrary, the DGCL and its counterparts predominantly offer default rules that can be altered through private ordering via the corporation's certificate of incorporation and bylaws."). Further, at the comprehensive reversion in 1960:

That certain mandatory provisions in the DGCL are not waivable by contract is also suggested by comparing the DGCL with Delaware's alternative entity statutes. Despite the broad freedom of contract afforded to Delaware corporations, unlike the alternative entity statutes the DGCL does *not* contain a provision endorsing freedom of contract to "maximum effect." As this Court recently noted in *United States v. Sanofi-Aventis U.S. LLC*, the function of the 'maximum effect' clause as it appears in the DRUPA is that a partnership agreement "controls in most circumstances," and the DRUPA itself "consist[s] largely of default 'gap-filler' provisions that govern when a partnership agreement is silent on an issue."[79] Although the DGCL is broadly an enabling act that

---

The distinguished group of experts who carefully examined and rewrote the DGCL, section by section, had the opportunity to craft statutory language that, if followed, would conclusively resolve the competing interests of managers and investors and foreclose any judicial inquiry under equitable principles. They declined to take that approach, recognizing that a rigid set of statutory rules could not properly balance the interests of managers and investors and achieve both efficiency and . . . opted instead to maintain corporate law's two-fold tradition: first, a broadly enabling statute *that nevertheless contains important and fairness-enhancing mandatory rules, such as requirements for the regular election of directors, stockholder votes on major transactions like mergers and sales of substantially all assets, and a stockholder right to access corporate books and records for a proper purpose*; and second, an equitable overlay of fiduciary duties, enforced primarily by the ability of stockholders to sue directors in the courts for breach of their duty of loyalty.

*Id.* at 10–11 (Emphasis added).

[79] 226 A.3d 1117, 1127 (Del. 2020) (citing 6 *Del. C.* § 15-103(d)). This Court has also stated in the context of the Delaware Limited Liability Company Act (noting that, "the following observations relating to limited partnerships applies as well to limited liability companies"):

The Act's basic approach is to permit partners to have the broadest possible discretion in drafting their partnership agreements and to furnish answers only in situations where the partners have not expressly made provisions in their partnership agreement. Truly, the partnership agreement is the cornerstone of a Delaware limited partnership, and effectively constitutes the entire agreement among the partners with respect to the admission of partners to, and the creation, operation and termination of, the limited partnership. Once partners exercise their

establishes default rules,[80] by not including such a provision in the DGCL, it is logical to infer that the General Assembly was drawing at least some distinction with other statutory business entity schemes. I believe this difference in the statutory structure reflects the General Assembly's intent to create different "brands" among the entity types and signals that Delaware corporations have at least a few features imposed by the DGCL that cannot be modified.[81]

A further comparison of these statutory schemes may hint at what some of these immutable features are. For example, the DRULPA and LLC Act authorize provisions that managers or partners will not owe fiduciary duties of loyalty to members or partners.[82] The statutes expressly authorize restriction on inspection rights.[83] Those entities need not

---

contractual freedom in their partnership agreement, the partners have a great deal of certainty that their partnership agreement will be enforced in accordance with its terms.

*Elf Atochem N. Am., Inc. v. Jaffari*, 727 A.2d 286, 291 (Del. 1999) (quoting Martin I. Lubaroff & Paul Altman, *Delaware Limited Partnerships* § 1.2 (1999)). *See also* 6 *Del. C.* § 17-1101(c) ("It is the policy of [the Limited Partnership Act] to give maximum effect to the principle of freedom of contract and to the enforceability of partnership agreements."); 6 *Del. C.* § 18-1101(b) ("It is the policy of [the LLC Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of limited liability company agreements."); 12 *Del. C.* § 3825(b) ("It is the policy of [the Trust Act] to give the maximum effect to the principle of freedom of contract and to the enforceability of governing instruments.").

[80] *E.g., Shintom Co., Ltd. v. Audiovox Corp.*, 888 A.2d 225, 227 (Del. 2005) ("The Delaware General Corporation Law is an enabling statute that provides great flexibility for creating the capital structure of a Delaware corporation.").

[81] *See, e.g.,* Welch & Saunders, *supra* note 66, at 846–47 ("mandatory terms guarantee that certain core qualities are associated with the particular 'brand' of business entity called a 'Delaware corporation.'").

[82] *See* 6 *Del. C.* § 18-1101(d); 6 *Del. C.* § 17-1101(e).

[83] *See* 6 *Del. C.* § 18-305(g); 6 *Del. C.* § 17-305(j).

have periodic elections of managers or general partners.[84] That the General Assembly saw fit to include these provisions suggest at least some support for the proposition that corresponding provisions in the DGCL are mandatory. For example, a Delaware corporation cannot eliminate the duty of loyalty or the periodic election of directors.[85]

The narrower question presented here is whether appraisal is among the mandatory provisions. The Court of Chancery rejected Petitioners' contention that Section 262 appraisal rights are mandatory. It held that "the DGCL does not explicitly prohibit contractual modifications or waiver of appraisal rights, nor does it require a party to exercise its statutory appraisal rights."[86] But I believe that there is more support for the

---

[84] *See* 6 *Del. C.*§ 18-402; 6 *Del. C.* § 17-402.

[85] *See* 8 *Del. C.* § 102(b)(7) (allowing for a corporate charter to exculpate the personal liability of a director for some breaches of fiduciary duty, but *not* for violations of "the director's duty of loyalty to the corporation or its stockholders" or for "knowing violation of law"). This Court long ago explained the importance of the duty of loyalty as a matter of public policy:

> If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation.

*Guth v. Loft, Inc.*, 5 A.2d 503, 270 (Del. 1939). Where it has deemed it desirable, the General Assembly has carved out areas where interested transactions implicating the duty of loyalty are permitted. *See* 8 *Del. C.* § 144(a) (addressing corporate transactions involving interested directors); 8 *Del. C.* § 122(17) (permitting a corporation, "in its certificate of incorporation or by action of its board of directors" to renounce interest in business opportunities that would otherwise accrue to it).

[86] *Manti Holdings, LLC v. Authentix Acq. Co.* (*Manti II*), 2019 WL 3814453, at *4 (Del. Ch. Aug. 14, 2019). Indeed, there are provisions of the DGCL containing express prohibitions on private ordering. *See, e.g.,* 8 *Del. C.* §§ 102(b)(7), 102(f). Thus, Section 262's lack of an express prohibition could be viewed as some support to find Section 262 waivers to be permissible. However, I believe the weight of the text of Section 262 and public policy underlying Section

argument that Section 262 appraisal rights are a mandatory feature of Delaware corporate law than against it. Aside from Chancellor Allen's statement in *Ford Holdings* that appraisal rights were "mandatory" and could not be modified in a charter *or otherwise*,[87] Section 262's use of the word "shall" suggests the General Assembly's intent.

In addition to the statutory textual evidence, the public policy underlying the purpose of Section 262 adds support to the view that its appraisal rights are mandatory. If one of the guideposts, in addition to the statutory test, is whether a provision is central to maintaining that delicate balance of power and checks and balances among the corporation's constituencies as I suggest, then consideration should be given to whether there is a public policy embedded in that provision that encompasses such checks and balances.[88] There is a case to be made that the statutory appraisal remedy falls into this

---

262 point towards prohibition. Further, Section 115's express permission of private ordering complicates the analysis and could cut against implying private ordering via stockholders agreements elsewhere. Just as in *Jones Apparel*, a "context- and statute-specific approach to police horribles" is preferable to a "sweeping rule" drawn from the presence of lack of magic words. 883 A.2d at 852 (internal quotation omitted).

[87] 698 A.2d at 976 (emphasis added).

[88] Many prior rulings from Delaware courts have taken great care to preserve these interlocking checks and balances. *See e.g. Seinfeld v. Verizon Commc'ns., Inc.*, 909 A.2d 117, 122 (Del. 2006) ("The evolution of Delaware's jurisprudence in section 220 actions reflects judicial efforts to maintain a proper balance between the rights of shareholders to obtain information based upon credible allegations of corporation mismanagement and the rights of directors to manage the business of the corporation without undue interference from stockholders."). As we recently explained:

> Delaware law recognizes that the stockholder franchise is the ideological underpinning upon which the legitimacy of the directors['] managerial power rests. Keeping a proper balance in the allocation of power between the stockholders' right to elect directors and the board of directors' right to manage the corporation is dependent upon the stockholders' unimpeded right to vote effectively in an election of directors.

category.  We recently recounted a brief history of the appraisal statute in *In re Solera Insurance Coverage Appeals*, 240 A.3d 1121 (Del. 2020).  Before its 1899 enactment, mergers required shareholder unanimity, an "unworkable" mechanism:

> At common law, before the Delaware appraisal statute was enacted, no consolidation or merger of corporations could be effected except with the consent of all the stockholders.  That scheme proved unworkable since one or more minority stockholders, if he or they desired to do so, could impede the action of all the other stockholders.

> The Delaware General Assembly created the appraisal remedy in 1899 to allow the sale of a corporation upon the consent of a majority of its stockholders rather than upon unanimous approval. As we said in *Dell*, given that a single shareholder could no longer hold up the sale of a company, the General Assembly devised appraisal in service of the notion that the stockholder is entitled to be paid for that which has been taken from him.  Minority shareholders who disagree with the sale or who view the sale price as inadequate can seek an independent judicial determination of the fair value of their shares rather than accept the per-share merger consideration.  Accordingly, appraisal is a limited legislative remedy developed initially as a means to compensate shareholders of Delaware

---

*Coster v. UIP Cos., Inc.*, --- A.3d ----, 2021 WL 2644094, at *7 (Del. June 28, 2021) (quotations omitted).  Similarly, corporate bylaws cannot divest shares of their statutory power to remove directors, such as by imposing supermajority requirements or requiring cause. *Frechter v. Zier*, 2017 WL 345142, at *4 (Del. Ch. Jan. 24, 2017) (citing 8 *Del. C.* § 141(k) and *In re Vaalco Energy, Inc. S'holder Litig.*, C.A. No. 11775-VCL (Del. Ch. Apr. 20, 2016)).  Likewise, aside from interim appointments to vacancies arising between annual meetings, directors cannot remove other directors -- that is, directors hold their positions due to the vote and under the authority of the shareholders, not each other:

> For 89 years, Delaware law has barred directors from removing other directors.  In 1974, when the stockholders' power to remove directors was confirmed and addressed through the adoption of Section 141(k), two leading authorities on the DGCL wrote that "by negative implication intended by the draftsmen, directors do not have the authority to remove other directors."  I do not believe the DGCL contemplates a bylaw amendment could overturn this rule.

*Kurz v. Holbrook*, 989 A.2d 140, 157 (Del. Ch. 2010) (footnote omitted) (citations omitted) (quoting S. Samuel Arsht & Lewis S. Black, ANALYSIS OF THE 1974 AMENDMENTS TO THE DELAWARE GENERAL CORPORATION LAW 378 (1974)), *aff'd in part, rev'd in part sub nom. Crown EMAK P'rs, LLC v. Kurz*, 992 A.2d 377 (Del. 2010).

corporations for the loss of their common law right to prevent a merger or consolidation by refusal to consent to such transactions.[89]

Thus, the trade-off for stockholders giving up the common law right to a unanimous vote, and thus a veto over mergers, was the statutory right to dissent and seek appraisal of their shares.[90] Viewed in this fashion, the appraisal remedy was a statutorily created right and remedy to compensate stockholders for the loss of a veto or blocking power over a transaction, and a check on the power to effectuate certain qualifying corporate transactions at an unfair price.

_____

[89] *Solera*, 240 A.3d at 1133 (footnotes and alterations omitted) (citing *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd.*, 177 A.3d 1, 19 (Del. 2017)).

[90] *Id.* Both the Court of Chancery and this Court repeatedly have explained the important historical and analytical connection between appraisal rights and the derogation of the common law unanimity requirement:

> At common law no consolidation or merger of corporations could be effected except with the consent of all the stockholders. This, at times, brought about an intolerable situation, since one or more minority stockholders, if he or they desired to do so, could impede the action of all the other stockholders. When this situation was changed by statute in Delaware, to permit the consolidation or merger of two or more corporations without the consent of all the stockholders, it became necessary to protect the contractual rights of such stockholders—who by reason of the statute lost their common law right to prevent a merger—by providing for the appraisement of their stock and the payment to them of the full value thereof in money

*Schenley Indus., Inc. v. Curtis*, 152 A.2d 300, 372–73 (Del. 1959) (citing *Chicago Corp. v. Munds*, 172 A. 452, 455 (Del. Ch. 1934) and 15 FLETCHER CYC. CORP. § 7165); *see also Salomon Bros. Inc. v. Interstate Bakeries Corp.*, 576 A.2d 650, 651–52 (Del. Ch. 1989) (explaining that "[t]he judicial determination of fair value pursuant to § 262 is a statutory right given the shareholder as compensation for the abrogation of the common law rule that a single shareholder could block a merger" and that "appraisal rights were provided as a *quid pro quo* for the minority's loss of its veto power") (citations and alterations omitted).

*IV.    Conclusion*

No doubt, the question of whether Section 262 appraisal rights are waivable, and if so, under what circumstances, is fraught with public policy issues.  On the one hand, the DGCL affords immense respect for freedom of contract and private ordering.[91]  On the other, there are public policy limitations imbedded in the text of the appraisal statute itself ("shall") and other public polices pertaining to appraisal rights in general, and maintaining the delicate balance of power among the Delaware corporation's constituencies.  There is also the notion that a Delaware corporation is a different "brand" of entity, as compared with alternative entities, and is known to have certain key features.[92]  Public policy determinations are quintessentially a legislative judgment.[93]  This is particularly so when the determination to be made hinges on the comparative weighing of polices in tension with one another.

---

[91] *See Salzberg*, 227 A.3d at 116 ("At its core, the DGCL is a broad enabling act which leaves latitude for substantial private ordering, *provided the statutory parameters and judicially imposed principles of fiduciary duty are honored.*") (alteration omitted) (emphasis added) (quoting *Williams*, 671 A.2d at 1381); *Abry Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032, 1059–60 (Del. Ch. 2006) ("There is . . . a strong American tradition of freedom of contract, and that tradition is especially strong in our State, which prides itself on having commercial laws that are efficient.").

[92] *See, e.g.*, *CML V, LLC v. Bax*, 28 A.3d 1037, 1043 (Del. 2011) ("[u]ltimately, LLCs and corporations are different; investors can choose to invest in an LLC, which offers one bundle of rights, or in a corporation, which offers an entirely separate bundle of rights," and that "in the LLC context specifically, the General Assembly has espoused its clear intent to allow interested parties to define the contours of their relationships with each other to the maximum extent possible.").

[93] *Sternberg v. Nanticoke Mem. Hosp., Inc.*, 62 A.3d 1212, 1217 (Del. 2013) ("[q]uestions of public policy are best left to the legislature") (citing *Shea v. Matassa*, 918 A.2d 1090, 1092 (Del. 2007) and *Moss Rehab v. White*, 692 A.2d 902, 909 (Del. 1997)).

Although it is a close call, I believe the better view is that appraisal rights are mandatory.  If the General Assembly disagrees, it can amend Section 262 to make clear that waivers are permissible and under what circumstances.[94]  Our DGCL is routinely revised and updated through the work of the Corporation Law Council of the Corporation Law Section of the Delaware State Bar Association and the General Assembly.  I believe that if such waivers are to be permitted, that any such waiver should be in the corporation's certificate of incorporation (which is publicly filed with the Secretary of State and which requires both stockholder and board approval).[95]

---

[94] The Majority cites the *de minimis* exception from appraisal rights for stockholders of public-traded corporations.  They then argue that if appraisal rights are "sacrosanct to the corporate form," then it would make little sense for the General Assembly to adopt this exception.  I think the 2016 *de minimis* amendment proves just the opposite.  The amendment to Section 262(g) was designed to address the concern that certain potential appraisal petitioners were targeting corporations and demanding settlements to address threatened appraisal claims, even non-meritorious claims.  Some referred to this phenomenon as "appraisal arbitrage."  A settlement made economic sense if it were less than estimated defense costs.  The synopsis to the 2016 amendments stated that "appraisal rights are essentially precluded unless the dispute with regard to valuation is substantial and involves little risk that the petition for appraisal will be used to achieve a settlement because of the nuisance value of discovery and other burdens of litigation."  Notably, the ban on *de minimis* claims does not apply to short-form mergers effected pursuant to Sections 253 or 267, because there, appraisal rights may be the only remedy available to stockholders in a short-form merger transaction.  *See* H.371, 148th Gen. Assembly, 80 Del. Laws c. 265, § 10 (2016).  My point is that it took an act of the *General Assembly* to carefully craft a restriction on appraisal rights, and it was done for the purpose of addressing an imbalance of corporate power resulting from the practice of using the appraisal statute to leverage settlements for non-meritorious claims.  Consistent with this approach, I believe any restriction on appraisal rights now sanctioned by the Majority should be effected by the General Assembly, if at all, and only after careful, deliberate debate informed by input from all relevant constituencies as is our typical practice in amending the DGCL.

[95] *See, e.g., Jones Apparel*, 883 A.2d at 846 ("Although the identification of what is a mandatory right might at times be difficult, the *Sterling* approach leaves the space for private ordering that the General Assembly's adoption of §§ 102(b)(1) and 141(a) clearly contemplated.").

The Majority tries to limit its holding to the facts presented. The Court of Chancery tried to do the same.[96] Authentix also suggests that "[t]his Court need not decide that appraisal rights can always be waived by common stockholders, or that agreement not to exercise appraisal rights are always permissible, but can instead limit its holding to the undisputed facts of this case."[97] Perhaps the use of a stockholders agreement is not of concern to them because of the difficulties and impracticality of using such an agreement in a public company setting. And perhaps they do not fear pressure to expand such waivers to encompass other statutory rights such as inspection rights. But the inevitable consequence of affirmance here is to create one set of rules for such private start-up companies and another for public companies. This is not a desirable outcome. Given the availability and the flexibility afforded by Delaware's alternative entity statutes, I am not ready to endorse *ex ante* waivers effectuated in stockholders agreements barring common stockholders from exercising mandatory provisions of the DGCL.

In sum, I would hold that the Stockholders Agreement fails to set forth an obligation from Petitioners to Authentix requiring them to refrain from seeking appraisal in all future mergers *ex ante* that unambiguously and unequivocally survives termination. Even if it had, I would hold that such a term goes to the heart of corporate governance and can only be contained in a corporate charter, not a bylaw or stockholders agreement. Even if it had been contained in a charter amendment, I would hold that such an amendment

---

[96] *Manti II*, 2019 WL 3814453, at *4 ("I need not decide whether a waiver of appraisal rights would be upheld in other circumstances.").

[97] Ans. Br. at 46.

contravenes the DGCL and cannot be valid without authorization from the General Assembly.

For these reasons, I respectfully dissent.